Scott A. PORTER *v.* STATE of Arkansas

CR 90-128                                          823 S.W.2d 846

Supreme Court of Arkansas
Opinion delivered January 27, 1992

*Witt Law Firm, P.C.,* by: *Ernie Witt,* for appellant.

*Winston Bryant,* Att'y Gen., by: *Sandy Moll,* Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. Appellant Scott Porter was sentenced to life in prison for the first degree murder of his eighteen-month-old stepson, Keith Richardson. The appellant

assigns seven (7) of the trial court's rulings as error. We hold that no reversible error occurred and affirm the judgment of conviction.

Two (2) of appellant's assignments of error involve sufficiency of the evidence. As a result, we set out the facts. Appellant and Melanie Richardson met in June 1988, at the Booneville Human Development Center where they both were employed. They dated for a few months and were married on November 10, 1988. At the time of the marriage, Melanie had a young son, Keith, who lived with his great grandmother, Nettie Richardson. After their marriage, Keith continued to live with his great grandmother, although he did spend a few nights with the appellant and Melanie.

Young Keith spent the week prior to his death with his great grandmother, Nettie Richardson, at her home about seven (7) miles out of Booneville. About 2:30 in the afternoon on Friday, February 3, Keith's mother, Melanie, and her husband, the appellant, went to Nettie's home to get Nettie and take her to a doctor. Appellant, Melanie, Nettie, and Keith left Nettie's home and drove to the doctor's clinic. Melanie and Nettie got out at the clinic, and the appellant left with Keith to go to his home in Booneville. The two were alone. According to appellant's statements and testimony, he took Keith inside the home, let his dog out, and made a telephone call. When he finished the phone conversation he looked around the house for Keith but didn't see him. He looked outdoors and saw Keith's legs behind a pile of wood stacked in the carport. He ran out and found Keith lying on his back near the woodpile with a log on his chest. He was gasping for air.

Appellant immediately took Keith to the closest doctor's office, the one where he had left Melanie and Nettie. However, the doctor was at the Booneville hospital, so the three of them left the clinic and went to the hospital. Enroute there, Melanie administered mouth-to-mouth resuscitation to Keith. She said there was some blood on the outside of his nose.

Dr. Charles Parker treated Keith at the Booneville hospital. He testified it appeared that the child had been beaten. His face and neck were swollen and bruised. The back and right side of his head were "soft and mushy." The injury was consistent with a

blunt trauma but was not consistent with a fall. He had fresh bruises on the right side of his forehead, and some older bruising under his jaw. He had an abrasion on his forehead. A surgeon was called in to perform a tracheotomy in preparation for transferring the child to St. Edwards Hospital in Fort Smith.

Before transferring the child, Dr. Parker spoke by phone with Dr. Albert McDade, a neurological surgeon in Fort Smith, to prepare him for Keith's arrival. Dr. Parker told Dr. McDade that Keith had a closed head injury and a lot of brain damage. In response to a question from Dr. McDade, he said he suspected child abuse because of the different ages and distribution of the bruises and the swelling around the child's neck.

Nurse Dorothy O'Bar was the emergency room nurse at the Booneville hospital. She observed bruises on the child's neck and head. The bruises on the neck were like finger marks, and there was a small amount of blood coming from the nose.

Dr. John Williams assisted in the treatment of Keith at the Booneville hospital and accompanied him on the ambulance trip to Fort Smith. He testified that Keith had multiple bruises on his head, and the back of his head felt "mushy" due to blood under his scalp. He stated that Keith suffered seizures because of brain damage or injury.

Nurse Gary Lem also attended Keith on the ambulance trip. He observed four (4) bruises on the right side of Keith's forehead that were consistent with an adult's knuckles. In addition, he noticed bruising in the soft tissue on each side of the neck.

Dr. Steven Graves attended Keith in the emergency room of St. Edwards. He testified that a computerized tomography scan of the brain showed both subarachnoid and subdural bleeding. Subarachnoid bleeding is below an inner layer of the cover of the brain. Subarachnoid bleeding alone is almost always due to severe shaking back and forth and the subdural bleeding suggested there had been a blow to the head by an adult.

Dr. Albert McDade also examined Keith at St. Edwards. He observed four (4) evenly distributed bruises on both the left and right sides of the forehead. The scalp was swollen on both sides, with the swelling being worse and more recent on the right side. There were hemorrhages in the eye grounds indicating acute and

rapidly increased pressure on the brain which usually occurs from an impact or shaking.

Keith's condition was critical by the time he reached St. Edwards Hospital, and he was taken to surgery to drill holes in his skull to allow the blood to escape and thereby reduce the pressure. The next day, February 4, his condition had deteriorated to the point that he was essentially brain dead. His blood pressure had to be artificially supported to keep him alive. A second brain scan showed that both sides of the brain had bruising, and there was white matter injury (ruptured nerves from shearing stress) which is consistent with the rapid acceleration and deceleration motions involved in violently shaking a child. The doctors discussed Keith's condition with Melanie, and later she stated that she did not want Keith to be kept alive artificially. The doctors took Keith off the respirator at 3:10 p.m., and he was pronounced dead at 3:40 p.m.

Dr. Fahmy Malak, the State's Chief Medical Examiner, performed an autopsy on Keith's body. With the aid of photographs taken during the autopsy, he testified that Keith had an old bruise in the center of his chest and one above his nose. He had two (2) adjacent fresh bruises on the right side of his forehead. On the left side of his forehead there were multiple small round bruises. There was a small old bruise behind his left ear and an older one under his jaw. There was a similar bruise on the right side of his neck under his jaw. He had three (3) small old bruises on his buttocks. On the back of his head, he had a large bruise extending from behind the ears toward the crown of the head and a fresh bruise on the back of the skull. There were blood clots at the base of the skull which were consistent with vigorous shaking. The scalp was separated from the skull, and this was consistent with vigorous hair pulling. There was bleeding around the optic nerves which was consistent with savage shaking. Dr. Malak testified that Keith died from a head injury caused by swelling of the brain and increased intracranial pressure which caused the heart and lungs to stop functioning.

Various witnesses, including Dr. Malak, testified that there was no evidence on Keith's body to indicate that either of the two (2) logs found near the woodpile had fallen on him. The logs weighed thirty-four (34) and twenty-two (22) pounds, and yet,

there was no external damage to Keith's skin or damage to his internal organs. The logs showed no evidence of blood or skin. Most importantly, the great grandmother, Nettie Richardson, testified that she bathed Keith on Friday afternoon, just before she, Melanie, the appellants, and Keith first went to the doctor's clinic. This bath would have been only about two (2) hours before the appellant brought a dying Keith back to the doctor's office. Her testimony is as follows:

Q. Okay. Had you bathed the child—

A. Yes, sir.

Q. —shortly before they arrived?

A. Yes, sir.

Q. Now, at that time would you tell the jury, please, Ms. Richardson, what you observed about the child in the form of bruises? Did he have any bruises on him—

A. He—

Q. —at the time you bathed him?

A. The only bruises he had was on his forehead and those on his throat, and they were old; they wasn't new.

Q. All right. Did he have any bruises anywhere else?

A. No, sir; nowhere.

She additionally stated that a few days earlier the appellant had attempted to explain away the bruises on the forehead and throat by stating that the bruise on the forehead came from playing with another child and the bruises about the throat came from the child's play pen.

W. C. O'Neil testified that he saw Keith on January 23, which was eleven (11) days before his death, and at that time he had two black eyes, a swollen nose, and a skinned place between his eyes about the size of a half dollar. The appellant told O'Neil that Keith hurt himself while playing. O'Neil questioned the truthfulness of appellant's explanation and, on cross-examination, stated:

Q. And then you queried Scott about that?

A. Yes, I did.

Q. And basically his — he told you that the child jumped off the step, or dove off the step, or something—

A. He said he was running across their dining room and jumping into the den, and I happen not to agree with it.

Q. Pardon me?

A. And I did not agree with him. I stated to him that the step was padded, carpeted, and it was only like the width of a two-by.

Q. Okay. If that was a true statement that Mr. Scott Porter made to you, would that child have had a carpet burn up here?

A. It wasn't a carpet burn. A carpet burn, I would think would be skinned sideways. This was a perfect circle cut.

■ The foregoing is substantial circumstantial evidence of a cruel, malicious, and continued course of child abuse culminating in a violent act that caused the death of Keith. The evidence is sufficient to sustain the conviction for knowingly causing the death of a person fourteen (14) years of age or younger under circumstances manifesting cruel and malicious indifference to the value of human life. *See* Ark. Code Ann. § 5-10-102(a)(3) (Supp. 1989).

Appellant's other argument involving sufficiency of the evidence is that removing the life support system was the intervening cause of death, and that child abuse was not the direct cause of death. This argument is wholly without merit. Ark. Code Ann. § 5-2-205 (1987) provides:

Causation may be found where the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant clearly insufficient.

■■ In interpreting this statute, we have written: "Where there are concurrent causes of death, conduct which hastens or contributes to a person's death is a cause of death." *Cox* v. *State*, 305 Ark. 244, 248, 808 S.W.2d 306, 309 (1991) (citing *Tackett* v. *State*, 298 Ark. 20, 766 S.W.2d 410 (1989)). Thus, even if there had been a concurrent cause for Keith's death, it is clear that the injury to his brain contributed to his death. Had he not suffered the brain injury which necessitated the use of the respirator, he would not have died.

■ Appellant also argues that the doctors did not require Keith's mother to request *in writing* that the extraordinary measures to prolong life be removed as required by Ark. Code Ann. § 20-17-202 (Supp. 1991), the statute which regulates discontinuances of extraordinary means to prolong life. He contends that their non-compliance with the statute is a defense to his criminal liability. We summarily dispose of the argument by stating that no such defense existed at common law and the cited statute is not intended as a criminal defense statute. The provision stating that such requests be in writing is for the protection of medical personnel. *See* Ark. Code Ann. § 20-17-203 (Supp. 1991).

■■ The appellant argues that the trial court erred in admitting seven (7) photographs taken during the autopsy. We summarily dispose of this argument, also. The admissibility of photographs rests within the sound discretion of the trial court, and we will not reverse without a showing of clear abuse of that discretion. *Morris* v. *State*, 302 Ark. 532, 792 S.W.2d 288 (1990). We cannot say the trial court abused its discretion in this case as each of the seven (7) pictures enabled the jury to understand the testimony about the injuries. The photographs are not pleasant to view, and they might be inflammatory, but they shed light on the various injuries.

■■ Appellant's next argument involves A.R.E. 615, or "the rule" concerning the exclusion of witnesses from the courtroom. The argument comes about because Charles Richardson, a witness for the State, testified on cross-examination that he asked a nurse, who had already testified, what questions were asked of her. Appellant immediately moved for a mistrial due to a violation of "the rule." The trial court denied the motion. We

have said many times that the granting of a mistrial is an extreme and drastic remedy that should only be resorted to when there has been an error so prejudicial that justice could not be served by continuing the trial. *See, e.g., Shaw* v. *State*, 304 Ark. 381, 802 S.W.2d 468 (1991). We cannot say the trial court abused its considerable discretion in this matter, especially in view of the fact that the trial court allowed appellant to question the witness extensively about the conversation and that reflected upon the witness' credibility. *See Graham* v. *State*, 296 Ark. 400, 757 S.W.2d 538 (1988). Additionally, see *Blaylock* v. *Strecker*, 291 Ark. 340, 724 S.W.2d 470 (1987) for a complete review of our case law applicable to A.R.E. 615.

■ The appellant also argues that the nurse's testimony should have been stricken because she talked to witness Richardson. This issue was not raised at trial, and we will not consider it for the first time on appeal.

The appellant next argues that the trial court erred in refusing to grant a mistrial as a result of prosecutorial misconduct. The argument comes about in the following way. The appellant took the witness stand to testify in his own defense. His attorney very appropriately tried to present appellant as a wonderful God-fearing choirboy who had grown into a wonderful and caring adult. His attorney asked about his background, and he responded that he was a local boy who went to the local high school, played sports there, and sang in the high school chorus. He testified that he sang with the New Life Singers Choir at the First Baptist Church in Booneville and sang all over Europe with the Southern Baptist Choir. He testified about his work with the Booneville Human Development Center. His testimony about that job is fairly abstracted as follows:

> In the job, basically, I helped them in their daily lives. I helped them pick out their clothes, or monitored their baths if there were a patient that was susceptible to seizure activity. I played big brother more than anything. These are basically what you would call grown children. They have mental ages anywhere from four to five, to approximately seventeen or eighteen, that is the men that I was directly working with. I worked with them for four or five months and then was transferred to another area. When I

was transferred I worked with retarded adult males, mental age of thirteen or fourteen months through probably a year or two old.

Abstract and Brief for Appellant at 173. On cross-examination of the appellant the following occurred:

BY MR. BULLOCK [PROSECUTING ATTORNEY]: (Cont'd.)

Q.   Mr. Porter, are you still employed at the Booneville Human Development Center?

Q.   No, sir; I'm not.

Q.   Were you discharged—

MR. RUSH [DEFENSE ATTORNEY]: Objection, your Honor.

THE AUDIENCE:   Ohhhh!

MR. DAVID RUSH:   Objection.

BY THE COURT:   Chambers.

And there won't be any more outbursts from the audience, or you will be evicted from the courtroom.

The appellant, the attorneys, and the judge then retired to chambers, and the judge asked the prosecutor if he had any basis for the question. The prosecutor stated that he did and that the appellant was fired from the job for carrying a gun. The defense attorney responded that he was fired for having a gun in his truck. The judge stated that he would sustain the objection, declined to grant a mistrial, and gave a limiting instruction to the jury not to consider the question.

We need not decide whether the prosecutor was guilty of any misconduct, and certainly a strong argument can be made that he was only "fighting fire with fire," *see Wortman* v. *Shipman*, 293 Ark. 253, 737 S.W.2d 438 (1987) and *Pursley* v. *Price*, 283 Ark. 33, 670 S.W.2d 448 (1984), because not every act of prosecutorial misconduct warrants the declaration of a mistrial. A mistrial is to be granted only where any possible prejudice cannot be removed by an admonition to the jury. *Holbird* v. *State*, 299 Ark. 551, 775 S.W.2d 893 (1989). Here, the question was not

completed, and it was not answered. Thus, the appellant has not shown that any prejudice occurred and, even if there was possible prejudice, has not shown that it was not removed by the court's admonition to the jury to disregard the question.

■ With regard to the outburst by the audience, the appellant did not ask for a cautionary instruction, he only asked for a mistrial. On several occasions we have held that a mistrial is not required when there is a spontaneous outburst by an audience. *See, e.g., Richmond* v. *State*, 302 Ark. 498, 791 S.W.2d 691 (1990). It is within the discretion of the trial court, and we cannot say the trial court abused its discretion in this case.

■ Appellant argues that the trial court erred in denying his motion for a new trial because of juror misconduct. The argument comes about as follows. During a recess in the trial, the appellant saw Dr. James Harbison, a potential State's witness, talking with the juror who later became foreman. He immediately informed his attorney, and they went to where the two had been talking in order to listen. Appellant's trial attorney failed to advise the court of the conversation at that time. He later filed a motion for a new trial based upon alleged juror misconduct. The court heard the motion for a new trial and heard testimony on the matter. Dr. Harbison testified that he was subpoenaed as a witness, reported to the courtroom a few minutes late, and was asked by the Sheriff to leave the courtroom, apparently after the witnesses were instructed about "the rule." He did not hear any instruction not to talk to jurors, but knew not to talk to them about the case. He testified that he talked to the juror during a recess, but he also unequivocally testified that he did not discuss the case with the juror. He stated that they had "shop talk" about the South Logan County Day Care Center, which the juror managed, and that he could have possibly mentioned the word "child" or "children" in the context of the day care center, but he did not think that he had done so. The appellant testified that he heard Dr. Harbison state "of the child" to the juror. The trial court found: "It has not been established that the two involved discussed this case." Accordingly, the trial court denied the motion for a new trial. That finding of fact was not clearly erroneous and, accordingly, we affirm the finding and the denial of the motion for a new trial on the basis of juror misconduct.

Appellant's trial attorney filed an appellate brief on the above discussed points of appeal and additionally argued that he should be allowed to withdraw because appellant had been deprived of effective assistance of counsel because he failed to timely notify the trial court of the conversation between Dr. Harbison and the jury foreman. The State filed a motion to remand pursuant to A.R.Cr.P. Rule 36.4, as amended July 1, 1989, and for new counsel to be appointed for that post-conviction issue. We granted the motion, new counsel was appointed, and a hearing was held. The trial court denied post-conviction relief based upon ineffective assistance of counsel. The ruling was correct.

In order for the appellant to show that he was afforded ineffective assistance of counsel, he must show that (1) counsel's performance was deficient in that counsel made an error so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment and (2) the deficient performance must have resulted in prejudice so pronounced as to have deprived the appellant of a fair trial, or a trial on which the outcome cannot be relied as just. *Finley* v. *State*, 295 Ark. 357, 748 S.W.2d 643 (1988). The trial court held that even if the appellant had met the first part of the above test he did not meet the second part, prejudice, and, as a result, declined to grant post-conviction relief. The ruling was correct. Even if the attorney had immediately notified the trial court of the conversation between Dr. Harbison and the juror, and an inquiry had been held immediately, the trial court's decision would have been not to grant a mistrial because there was no prejudice. Thus, appellant did not prove prejudice so pronounced as to have deprived him of a fair trial.

Pursuant to Rule 11(f) of the Rules of the Supreme Court and the Court of Appeals, an examination of the complete record has been made for any prejudicial error which may have been objected to below, but not argued on appeal. There is no such prejudicial error.

Accordingly, we affirm on direct appeal as well as on post-conviction appeal.