Charles DEPEW *v.* James L. JACKSON

97-553 957 S.W.2d 177

Supreme Court of Arkansas
Opinion delivered December 11, 1997

*Bernard Whetstone, P.A.*, by: *Bernard Whetstone* and *Kevin Odum*, for appellant.

*Anderson & Kilpatrick, L.L.P.*, by: *Joseph E. Kilpatrick, Jr.*, and *Penny B. Wilbourn*, for appellee.

ANNABELLE CLINTON IMBER, Justice. The appellant obtained a $1,600 jury verdict on a negligence claim brought against the appellee. The appellant moved for a new trial and argued, among other things, that the verdict was clearly against the preponderance of the evidence and that the jury erred in assessing the amount of the recovery. The motion was deemed denied, and the present appeal ensues. We find no error and affirm.

On August 1, 1995, Charles Depew was a passenger in a vehicle that was struck from behind in an automobile accident. Depew filed a complaint against James Jackson, alleging that the accident and his resulting injuries were due to Jackson's negligence. Jackson admitted liability, and the case was submitted to the jury on the issue of damages only. At trial, Depew testified

that the collision snapped or popped his neck back. A few days later, he developed increasing pain and soreness in his neck area. X-rays taken after a visit to the emergency room revealed a possible fracture in Depew's spine, and Depew was referred to a neurosurgeon, Dr. Anthony Russell.

Dr. Russell examined Depew and recommended surgery. According to Dr. Russell, Depew had a bone that was not properly connected to another bone in his neck — this resulted in the possibility that the floating bone might be driven into his brain stem, rendering Depew a quadriplegic. This condition, known as an os odontoideum, was either a congenital abnormality where the bone fails to fuse properly, or a fracture that had occurred several years earlier and had failed to fuse and heal properly. Dr. Russell stated that it most likely "formed way back in the embryonic stage." Cables were used in the surgery to fuse the floating bone with another piece of bone. As a natural consequence of this procedure, Depew lost range of motion in his neck, including a degree of stiffness. Constant pain was also consistent with the surgery, in addition to headaches. Depew later went to another physician to receive treatment for his pain, which included injections and other medications.

Depew's medical bills amounted to over $15,000. Depew's expert witness projected total damages in the amount of $345,794, which figure included past and future medical expenses, loss of household services and pain and suffering.

The jury returned a verdict for Depew in the amount of $1,600. Depew filed a motion for new trial, which was deemed denied. While Depew articulates a number of points on appeal, his argument consists of two primary components — that the verdict was clearly against the preponderance of the evidence, and that the jury erred in the assessment of the recovery.

### 1. *Ark. R. Civ. P. 59(a)(6).*

When a motion for new trial is made on the ground that the verdict was clearly against the preponderance of the evidence and is denied by the trial court, *see* Ark. R. Civ. P. 59(a)(6), this court will affirm if there is substantial evidence to support the

verdict. *Esry v. Carden*, 328 Ark. 153, 942 S.W.2d 846 (1997); *Patterson v. Odell*, 322 Ark. 394, 909 S.W.2d 648 (1995). Substantial evidence is evidence of sufficient force and character to compel a conclusion one way or the other with reasonable certainty. *Esry, supra.* The evidence must force the mind to pass beyond suspicion or conjecture. *Esry, supra.* In examining whether substantial evidence exists, the verdict is given "the benefit of all reasonable inferences permissible in accordance with the proof." *Patterson, supra.*

As controlling authority, Depew relies almost exclusively on *Young v. Honeycutt*, 324 Ark. 120, 919 S.W.2d 216 (1996), a case where the trial court granted the plaintiff's motion for new trial following a defendant's verdict in a negligence case. Given that *Young* involved the appellate review of the grant of a motion for new trial, it provides us with little guidance in the present case.[1] Moreover, in *Young* there was no dispute that the plaintiff's injuries were sustained as a result of the accident. By contrast, the issue of proximate causation is the crux of the present case.

In attempting to show that the verdict was not supported by substantial evidence, Depew quotes extensively from Dr. Russell's testimony concerning the stability of Depew's spine both before and after the accident:

> Q: [Y]ou can go on and have a fracture and still remain stable?
> A: Yes.
>
> * * *
>
> Q: Then all at once you have some kind of insult or something happens to your body and it affects your stability at that point, then you start having trouble?
> A: Yes.

---

[1] Depew also quotes from *Young* to make a number of other points regarding appellate review of the grant of a new trial that have little bearing in the present case. Here we are not concerned with the grant of a new trial. The same can be said for Depew's assertion that when a new trial has been granted, it is "more difficult" to show an abuse of discretion on appellate review because the opposing party will have another opportunity to prevail. *See, e.g., Diamond State Towing Co., Inc. v. Cash*, 324 Ark. 226, 919 S.W.2d 510 (1996); *Bristow v. Flurry*, 320 Ark. 51, 894 S.W.2d 894 (1995).

When asked his opinion of Depew's stability up until the time of the accident, Dr. Russell answered "stable with the potential for instability." When asked about Depew's stability given that he had no pain or dysfunction in the neck region up until the time of the accident, Dr. Russell testified "[i]t would tell you that most likely he was stable during that time although you could still be unstable." Dr. Russell added that Depew's pre-accident level of functioning did "not necessarily" indicate that he was stable, although in "almost all cases" the patient would have known about it sooner if he had instability. Ultimately, Dr. Russell opined to a reasonable degree of medical certainty that Depew was "[n]ot grossly unstable" before the accident. The fact that Depew had no pre-accident pain "could be an indicator that he had become unstable at the time of the collision." When asked whether an "[os odontoideum] can remain stable all your life until you're sixty-two years old," Dr. Russell replied "True." Plaintiff's counsel then asked, "And you'll never know you had it?":

> A: That's true because you've still got all your ligaments in there holding it to this bone like it's supposed to be there.
> Q: That keeps it stable?
> A: That keeps it stable, yes.

In operating on Depew, Dr. Russell wanted to "restore stability to [Depew's] spine." In a letter written to Depew's attorney, Dr. Russell wrote that Depew's "paraspinous muscle spasm" was a sequelae of his recent auto accident. In other deposition testimony Dr. Russell stated that it was his opinion within a reasonable degree of medical certainty that "the automobile accident aggravated the preexisting condition leading to [Depew's] ultimate surgical procedure." Dr. Russell answered in the affirmative when asked whether it was a reasonable assumption that Depew's neck pain was caused by the collision, considering that he had no neck pain before but had persistent neck pain afterward.

The above-recited evidence does support Depew's theory that the collision rendered his spine unstable, necessitating stabilizing surgery. However, other portions of Dr. Russell's testimony are equivocal on the point, and tend to support Jackson's position that the collision had nothing to do with aggravating or worsening

Depew's condition — the accident and resulting x-rays simply led to the discovery of the defect.

As quoted above, Dr. Russell testified that the os odontoideum condition was most likely congenital. Dr. Russell explained that "[t]he fracture was discovered by the emergency room physician at Southwest and then brought to my attention. Certainly, I commented on it, felt like it needed surgery." When asked on cross examination whether he recommended surgery "[b]ecause of that condition where that is not fused," and "because you thought that condition alone posed some threat to Mr. Depew," Dr. Russell answered in the affirmative. Dr. Russell opined that the os odontoideum "certainly" occurred before the accident, and that the accident did not make the fracture any worse. At one point the following colloquy occurred:

> Q: And this [is] a very similar thing. It showed a condition that was there?
> A: Yes.
> Q: Not caused by the accident?
> A: No.
> Q: Not made worse just shown to you, is that right?
> A: Correct.

Thus, this above-recited evidence shows that Dr. Russell operated to repair a congenital defect that was not caused or even worsened by the accident. The accident had the incidental result of bringing Depew into the hospital for x-rays, which allowed the os odontoideum condition to be discovered. In reading from deposition testimony at trial, Dr. Russell was asked "Do you still stick with your statement that. . . [Depew] had a C-1, 2 instability aggravated by a motor vehicle accident?" Dr. Russell replied:

> In the terms you're asking for in a legal sense, I guess what I'll have to say is no, you're wanting me to say that the accident. . . When I said aggravated what I meant to say was, brought to our attention, that's what I should have said. The accident brought this problem to our attention.

Dr. Russell could not say that it was "a hundred percent certain" that the accident aggravated a preexisting problem. In being asked whether he had changed his mind as to whether the accident aggravated a preexisting injury, Dr. Russell answered:

[Reading from deposition testimony.] "I haven't changed my mind. I maintain the point that he had a preexisting condition, that due to the automobile accident, it was brought to our attention. And it ultimately led to his surgery, yes. I mean. . . I'll never, ever dictate the word 'aggravated' in anything I do again because it seems to be a point of contention here. I don't know. It's suddenly changed meaning for me." And I went on to state that due to the surgery, he will have permanent impairment, decreased range of motion, secondary to the operative procedure.

Depew makes much of the following statement contained in a letter written by Dr. Russell:

In my opinion it is more likely than not that had Charles Depew not been involved in the vehicle collision of August 1, 1995, and had not received any other injury to his neck then he probably would have lived the balance of his life in the same condition that he was in before the collision.

However, this statement does not necessarily establish that the collision proximately caused or aggravated the os odontoideum condition. Dr. Russell testified that a person with an os odontoideum condition could live "until you're sixty-two" and not even know there was a problem. As a result of the collision, the os odontoideum condition was discovered and Dr. Russell recommended surgery to prevent the possibility, however remote, of the floating bone compressing the spinal chord and causing paralysis. As explained by Dr. Russell, "The surgery is not for those ninety-nine who don't get injured it's for that one that trips and become[s] Christopher Reeve."

 In summary, Dr. Russell's testimony cuts both ways. While portions of it show that Depew's spine was stable before the accident and unstable afterward, other portions establish that Depew had a congenital defect that was not caused or worsened by the collision. The incidental x-rays necessitated by the collision simply allowed the defect to be discovered and treated. Thus, the loss of mobility and pain due to the surgery, and the accompanying decrease in Depew's ability to perform routine activities, were not proximately caused by Jackson's negligence. Given the character of this testimony, the jury did not have to resort to conjecture or speculation to arrive at its verdict. This is especially true

considering that we are to give the verdict "the benefit of all reasonable inferences permissible in accordance with the proof." *See Patterson, supra*. Because substantial evidence supports the verdict, we cannot say that the trial court erred in denying Depew's motion for new trial on the ground that the verdict was clearly against the preponderance of the evidence.

### 2. *Ark. R. Civ. P. 59(a)(5)*.

■ Generally, where the primary issue on appeal is the alleged inadequacy of the jury's award, *see* Ark. R. Civ. P. 59(a)(5), this court will affirm the denial of a motion for new trial absent a clear and manifest abuse of discretion. *See Whitney v. Holland Retirement Ctr., Inc.*, 323 Ark. 16, 912 S.W.2d 427 (1996); *Luedemann v. Wade*, 323 Ark. 161, 913 S.W.2d 773 (1996); *National Bank of Commerce v. McNeill Trucking Co., Inc.*, 309 Ark. 80, 828 S.W.2d 584 (1992); *Smith v. Petit*, 300 Ark. 245, 778 S.W.2d 616 (1989). "An important issue is whether a fair-minded jury could have reasonably fixed the award at the challenged amount." *Luedemann, supra* (citing *Smith, supra*).

■ ■ In the present case, a fair-minded jury could have reasonably fixed the award at $1,600. Obviously, the jury accepted Jackson's theory of the case, and declined to award Depew damages for any of his surgery-related medical bills. As more fully discussed in the prior point, there was substantial evidence from which the jury could have decided that the surgery, and therefore the resulting pain and loss of mobility, were due to a preexisting condition and not proximately caused by the automobile accident. Thus, a fair-minded jury could have reasonably decided to exclude the surgery-related medical bills from its award. The record reflects that most of the $15,000 in medical bills incurred by Depew related to the surgery. The mere fact that a plaintiff has incurred medical expenses and the defendant has admitted liability does not automatically translate into a damage award equivalent to those expenses. *See Kratzke v. Nestle-Beich, Inc.*, 307 Ark. 158, 817 S.W.2d 889 (1991). Based on the foregoing, we cannot say that the trial court clearly and manifestly abused its discretion in denying Depew's motion for new trial on

the ground that the jury erred in the assessment of the amount of recovery.

Affirmed.