Cite as 2025 Ark. App. 268 (Substituted by 2025 Ark. App. 400)

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-22-305

|  |  |
|---|---|
| OLD DOMINION FREIGHT LINE, INC.; AND AARON MARVELL FOSTER **APPELLANTS** | Opinion Delivered April 30, 2025 |
|  | APPEAL FROM THE ST. FRANCIS COUNTY CIRCUIT COURT [NO. 62CV-20-141] |
| V. |  |
|  | HONORABLE E. DION WILSON, JUDGE |
| FRANK MCMILLION, ALLEN JONES, CARLTON PETTUS, HUNTER BOKKER, BENGI BOKKER, AND ZACK BILLINGSLEY **APPELLEES** | AFFIRMED IN PART; REVERSED AND REMANDED IN PART |

**ROBERT J. GLADWIN, Judge**

The appellants in this case are a trucking company and the driver of a semi-truck who was involved in a serious accident in St. Francis County. The appellees are two law enforcement officers and four members of a clean-up crew who alleged they were unwittingly exposed to hazardous materials. After a week-long jury trial, the appellees received a combined verdict of $75 million in compensatory damages.

The appellants raise twelve points on appeal.

We affirm in part, reverse in part, and order a new trial on damages.

I. *Factual and Procedural Background*

On April 20, 2018, at approximately 3:00 p.m., a pickup truck driven by Charles Henley collided head on with a semi-truck on Highway 70 in St. Francis County. The accident caused the semi-truck, which was hauling two trailers, to flip and catch fire. The pickup-truck driver died on the scene. There is no dispute that Henley was the sole cause of the accident.

Aaron Foster was driving the semi-truck for Old Dominion, and the load included one barrel of formic acid weighing 565 pounds. The Hazardous Materials Transportation Act (the "HMTA") requires that a trailer display a placard only if the truck is hauling more than one thousand pounds of hazardous materials. There was no dispute at trial that Old Dominion was not required to placard the load involved in the accident.

Foster was still in the cab of the semi-truck when it rolled and caught fire. He kicked a window out of the truck to escape. Tim Morrow, another Old Dominion driver, happened to be traveling by the scene just after the accident happened, and he pulled over. Morrow gave Foster his cell phone to report the accident to Old Dominion. Kristen Phagan witnessed the accident, and she and her husband also pulled over to assist. She testified that she was either with or very near Foster in the immediate aftermath.

Keith Ponder was the first law enforcement officer to respond to the scene. At the time of the accident, he was a trooper for the Arkansas State Police ("ASP"). Ponder testified that he asked Foster whether he had been hauling hazardous materials and that Foster replied he was not. Foster and Phagan both testified that Ponder did not ask whether there were hazardous materials on the truck.

Jeff Goff, a deputy for the St. Francis County Sherif's Department, also responded to the accident. He testified that he also asked Foster whether the load contained hazardous materials, and Foster stated it did not.

Law enforcement and other first responders proceeded to work the scene. Frank McMillion, one of the appellees, was a trooper for the ASP at the time of the accident. Discussed in more detail below, McMillion testified about his training with the ASP regarding hazardous materials and said that he was trained to clear the area if a site involved formic acid. He arrived at approximately 3:53 p.m. McMillion testified that approximately two hours after he got to the scene, he smelled a strong odor different from the odor of diesel fuel or other burning materials present at other accident scenes. He became nauseated and dizzy. McMillion said he went to his car and felt better but that he started experiencing difficulty breathing and burning in his throat after being on the scene longer.

Another law enforcement officer to respond, Allen Jones, was a corporal with the St. Francis County Sheriff's Office at the time of the accident. He is also one of the appellees. There was testimony that he also felt a burning sensation in his nose while at the site.

Old Dominion contacted FleetNet America to assist with the cleanup effort. FleetNet called White Motor Company, a tow-truck company. White Motors Company's employees reached the scene between 4:00 and 4:30, and the crew included the other four appellees—Bengi Bokker, Hunter Bokker (Bengi's son), Zack Billingsley, and Carlton Pettus. If it had been clear there was hazardous material at the scene, White Motor Company would not have responded to the scene. Instead, a company that specializes in cleaning up hazardous

3

materials would have responded. While they were on the scene, Bengi, Hunter, Billingsley, and Pettus all experienced difficulty breathing and had burning sensations in their noses, throats, and eyes. Some of them also testified they smelled a very strong chemical odor as or before the symptoms started.

By the time the crew from White Motor was exposed, the accident was no longer on fire; it was smoldering, and there may have been some smoke.

The first notification to anyone at the scene that the truck contained a hazardous chemical was at approximately 7:45 p.m. when Old Dominion provided a bill of lading showing the barrel of formic acid. Formic acid is a corrosive substance that has "acute toxicity" when vaporized.

All the appellees went to the emergency room on the night of the exposure, some of them by ambulance. Their specific injuries are discussed below.

The trial for this matter took place December 7–15, 2021. The appellees argued that Foster and Old Dominion (the appellants) were negligent in their failure to notify the appellees about the presence of a hazardous material on the truck. They did not seek damages for medical expenses. Instead, they asked the jury for (1) "the nature, extent, duration, and permanency of any injury and whether it is temporary or permanent" and (2) "[a]ny pain and suffering and mental anguish experienced in the past and reasonably certain to be experienced in the future." They also sought punitive damages.

The trial was bifurcated: phase one was to determine liability for compensatory and punitive damages and to award an amount for compensatory damages. This opinion discusses more fully below the events at trial that are relevant to this appeal.

Phase two would have determined the amount of punitive damages. The jury returned a combined verdict in phase one of $75 million in compensatory damages and found that the appellants were not liable for punitive damages. Accordingly, there was no phase-two trial.

The appellants filed a timely motion for new trial or remittitur, arguing the verdict was excessive. The circuit court never ruled on that motion, and it was deemed denied.

## II. *Issues on Appeal*

The appellants raised twelve points on appeal, and we address each below in roughly the order they were briefed.

### 1. *Causation*

The appellants first urge us to reverse the judgment because the appellees failed to prove causation at trial. This argument has two distinct facets: (1) that the appellees should have been required to meet a toxic-tort standard of causation and (2) that the appellees did not prove proximate causation.

These causation arguments were subject to a motion for directed verdict. "When reviewing a denial of a motion for directed verdict, we determine whether the jury's verdict is supported by substantial evidence." *City of Little Rock v. Nelson ex rel. Nelson*, 2020 Ark. 34, at 5, 592 S.W.3d 633, 638. "In conducting our review, we do not try issues of fact. Rather,

5

we simply examine the record to determine if there is substantial evidence to support the jury's verdict. However, questions of law will be reviewed de novo." *Id.*

### 1. *Toxic-tort causation*

First the appellants contend that the appellees should have been required to meet the causation standard applicable to toxic-tort cases. This question is a matter of law.

Arkansas has several cases involving chemical exposures that take place over a course of years. *See Chavers v. Gen. Motors Corp.*, 349 Ark. 550, 79 S.W.3d 361 (2002) (asbestos exposure); *Green v. Alpharma, Inc.*, 373 Ark. 378, 284 S.W.3d 29 (2008) (chicken-litter exposure); *Richardson v. Union Pac. R.R. Co.*, 2011 Ark. App. 562, 386 S.W.3d 77 (diesel fuel, exhaust, creosote, and pesticide exposure). These are unquestionably toxic-tort cases that have established certain requirements a plaintiff must meet in order to prove his or her injury was caused by the exposure in question.

For example, in *Richardson*, this court noted that a plaintiff in a toxic-tort case must prove general causation, i.e., "whether a particular agent can cause a particular illness," and specific causation, i.e., "whether that agent in fact caused the particular plaintiff's illness." 2011 Ark. App. 562, at 3–4, 386 S.W.3d at 80. In *Chavers*, the supreme court established a test wherein a plaintiff in an asbestos-exposure case must prove exposure, frequency, regularity, proximity, and specific causation. 349 Ark. at 562, 79 S.W.3d at 369.

The lone Arkansas case involving a one-time exposure is *TMG Cattle Co., Inc. v. Parker Com. Spraying, LLC*, 2018 Ark. App. 144, 540 S.W.3d 754. In *TMG Cattle*, the defendant sprayed urea fertilizer in a wheat field adjacent to the field where the plaintiff's cattle were

grazing. Eighteen cows were discovered dead around a pond three or four days after the fertilizer application. *Id.* at 1–2, 540 S.W.3d at 756. The circuit court granted summary judgment to the defendant because the plaintiff's veterinarian "did not definitively link the cows' death to the consumption of urea fertilizer." *Id.* at 2, 540 S.W.3d at 756 This court reversed the circuit court's order, finding that the veterinarian's opinion gave rise to an issue of fact regarding causation. The veterinarian had opined that lab results did not show urea poisoning because they were taken too late but that all the circumstances surrounding the cows' deaths led him to believe they had died from ingesting urea. *Id.* at 7–8, 540 S.W.3d at 758–59. In conducting the analysis, this court declined to apply the *Chavers* test to those specific facts. In a footnote, this court stated:

> We disagree with this analysis. In a toxic-tort case, the plaintiff's injuries are generally the result of a series of events occurring over a considerable length of time and under different circumstances. *See Ga.-Pac. Corp. v. Carter*, 371 Ark. 295, 303, 265 S.W.3d 107, 113 (2007); *Baker v. Wyeth–Ayerst Labs. Div.*, 338 Ark. 242, 992 S.W.2d 797 (1999). This is not a toxic-tort case; this is not a case involving a series of events occurring over a considerable length of time. This was a single event in which eighteen cows died, apparently at once and apparently of the same cause. We therefore decline to consider or apply the "frequency, regularity, and proximity" test to this factual scenario.

*Id.* at 4 n.1, 540 S.W.3d at 757 n.1.

Arkansas appellate courts have decided a line of cases that distinguish between a "mass accident" and a "toxic tort." Both mass accidents and toxic torts can involve injuries to property or people, so the fact that *TMG Cattle* related to cattle does not mean that the same standards are inapplicable to humans. Further, although the cases discussing this

7

difference relate to class-action certification, we consider that the distinction would continue to apply through the case.

In *Baker*, 338 Ark. 242, 992 S.W.2d 797, the supreme court analyzed a case in which the plaintiffs alleged injuries after taking a weight-loss drug. When analyzing the "predominance" requirement for class certification, the supreme court noted there are different types of mass-tort actions: "1) mass-accident cases where injuries are caused by a single catastrophic event occurring at one time and place; and 2) toxic-tort or products-liability cases where the injuries are a result of a series of events occurring over a considerable length of time and under different circumstances." *Id.* at 247, 992 S.W.2d at 800. Mass-accident cases are much more likely to be certified as class actions than toxic-tort cases. This is because in a toxic-tort case, "no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each defendant, and the individual issues outnumber common issues." *Id.* (quoting *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988)) (internal quotation marks omitted). In other words, the same law and facts will usually predominate in a mass-accident case, and the same is not usually true in a toxic-tort case.

Another class-certification case involved personal injuries and property damages allegedly caused by vapors and gases emitted from an industrial wastewater treatment system. *Ga.-Pac.*, 371 Ark. at 303, 265 S.W.3d at 113. The supreme court reiterated its distinction between toxic-tort and mass-accident cases, stating, "[C]ourts typically distinguish between mass-accident cases, where injuries are caused by a single, catastrophic event occurring at one

8

time and place, and toxic-tort or products-liability cases, where the injuries are the result of a series of events occurring over a considerable length of time and under different circumstances." *Id.*

One year later, the supreme court found that the same facts and law would predominate in a case involving an explosion at a hazardous waste storage and treatment facility. *Teris, LLC v. Chandler*, 375 Ark. 70, 289 S.W.3d 63 (2008). Not only did the same facts and law predominate, but the supreme court also held, "The fact that damages may vary for members of the class does not defeat the finding of predominance." *Id.* at 83, 289 S.W.3d at 72. Again, the context of class certification is different from the present case, but the discussion of a mass accident versus a mass tort is instructive.

Given the discussion in the class-certification context, we believe that the *TMG Cattle* footnote mentioned above is a correct statement of Arkansas law and that a toxic-tort case involves a series of events that occur over a time longer than a few hours. This is more in line with *TMG Cattle* and the mass-accident cases and not cases that involve a single catastrophic event that takes place and leads to the appellees' injuries. For these reasons, we affirm the circuit court's decision declining to apply a heightened standard of causation to the appellees.

### 2. *Proximate causation*

"Our case law is replete with the proposition that causation is almost always a question of fact for the jury and not appropriate for summary judgment." *Green*, 373 Ark. at 395, 284 S.W.3d at 42. Because proximate causation is a factual issue, and we are considering

the denial of a directed-verdict motion, the standard of review is whether substantial evidence supports the jury's verdict. Substantial evidence is "of sufficient force and character to compel a conclusion one way or another with reasonable certainty. We review the evidence and all reasonable inferences arising therefrom in the light most favorable to the party on whose behalf judgment was entered." *Id.*

To succeed in a negligence action, the plaintiff must prove proximate cause, which is "that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." *TMG Cattle*, 2018 Ark. App. 144, at 4, 540 S.W.3d at 757 (quoting *Pollard v. Union Pac. R.R. Co.*, 75 Ark. App. 75, 79, 54 S.W.3d 559, 562 (2001)). It can be proved using circumstantial evidence, and "such evidence is sufficient to show proximate cause if the facts proved are of such a nature and are so connected and related to each other that the conclusion therefrom may be fairly inferred." *Id.* However, "[p]roximate causation cannot be based on mere coincidence." *Wirth v. Reynolds Metal Co.*, 58 Ark. App. 161, 169, 947 S.W.2d 401, 405 (1997).

The appellants argue that, even if no toxic-tort standard is required, the appellees still did not prove proximate causation, and their directed-verdict motion should have been granted. We disagree.

Dr. Manaker, a pulmonologist and the appellees' expert, testified that he had examined the appellees, performed medical tests on them, and reviewed their medical records. Although he testified that he had not seen any scientific studies linking the

10

appellees' medical injuries to formic acid, he did testify about how the injuries may have been related. He testified that reactive airway dysfunction syndrome ("RADS"), exacerbation of chronic obstructive pulmonary disease ("COPD"), asthma, and rhinosinusitis could all be caused by exposure to corrosive acids. He also testified that exacerbation of coronary artery disease could have been caused by the stress induced by the incident. He further testified that gastroesophageal reflux disease ("GERD") could be caused by swallowing particles of formic acid that had vaporized. This is all similar to the circumstantial evidence presented at the summary-judgment phase by the plaintiffs in the *TMG Cattle* case—that the cattle had all been exposed to a substance known to be deadly to cows, there was a group that died at the same time, and they all appeared to die of the same cause. *TMG Cattle*, 2018 Ark. App. 144, at 7, 540 S.W.3d at 758–59. Viewing the evidence in the light most favorable to the party on whose behalf judgment was entered, there is substantial evidence to support proximate causation in this case. We affirm on this point.

B. Preemption

The appellants' next argument is that the circuit court erred when it denied their motion for a directed verdict on the issue of federal preemption. Because this is a legal issue, the standard of review is de novo. *City of Little Rock*, 2020 Ark. 34, at 5, 592 S.W.3d at 638.

Under the doctrine of preemption, a state cannot impose a legal requirement that conflicts with federal law. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663 (1993). Preemption is based on the Supremacy Clause of the United States Constitution. *Emerald Dev. Co. v. McNeill*, 82 Ark. App. 193, 197, 120 S.W.3d 605, 608 (2003). In a preemption

11

analysis, we are guided by whether the United States Congress intended to preempt state law. *Id.* We have noted in the past:

> There are three types of preemption: 1) express preemption, where Congress defines explicitly the extent to which its enactments preempt state law; 2) field preemption, where Congress's regulation of a field is so pervasive or the federal interest so dominant that an intent to occupy the entire field can be inferred; and 3) conflict preemption, where state law stands as an obstacle to the accomplishment of the full purposes and objectives of a federal statute or where compliance with both laws is impossible.

*Id*. The appellants here argue that express preemption bars the appellees' lawsuit.

The federal statute at issue is the Hazardous Materials Transportation Act (the "HMTA"), codified at 49 U.S.C. §§ 5101 et. seq. The purpose of the HMTA "is to protect against the risks to life, property, and the environment that are inherent in the transportation of hazardous material in intrastate, interstate, and foreign commerce." 49 U.S.C. § 5101. The HMTA contains a lengthy preemption clause at § 5125. A state cannot impose a requirement "that is not substantively the same as" the provisions of the HTMA regarding:

> (A) the designation, description, and classification of hazardous material.

> (B) the packing, repacking, handling, labeling, marking, and placarding of hazardous material.

> (C) the preparation, execution, and use of shipping documents related to hazardous material and requirements related to the number, contents, and placement of those documents.

> (D) the written notification, recording, and reporting of the unintentional release in transportation of hazardous material and other written hazardous materials transportation incident reporting involving State or local emergency responders in the initial response to the incident.

(E) the designing, manufacturing, fabricating, inspecting, marking, maintaining, reconditioning, repairing, or testing a package, container, or packaging component that is represented, marked, certified, or sold as qualified for use in transporting hazardous material in commerce.

49 U.S.C. § 5125(b)(1)(A)–(E). Because this is an express preemption clause, this court should focus "on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *CSX Transp.*, 507 U.S. at 664.

The appellants argue they were found negligent for failing to do more than federal law required, and the HMTA preempts such a finding. They argue first that the circuit court imposed a heightened placarding duty than required under the HMTA and, second, that the circuit court imposed a heightened duty to notify the first responders.

As to appellants' first contention, there was undisputed testimony that the appellants were not required to display a hazardous-materials placard. Further, the jury instructions included the statute stating that placarding was permissive, rather than required, when the hazardous materials weigh less than 1001 pounds. There was undisputed testimony and documentary evidence that there was less than 1001 pounds of formic acid on the truck. Unless there is a reason to hold otherwise, this court assumes the jury followed the law as stated in the jury instructions. *KW-DW Props., LLC v. Ark. State Highway Comm'n*, 2019 Ark. 95, at 6, 571 S.W.3d 6, 9. The evidence, argument, and jury instructions all make clear that the circuit court did not impose requirements above those of the HMTA regarding placarding.

The appellants' other argument is that the circuit court imposed a higher duty of notification than the HMTA requires. The statute requires, "When an incident involving hazardous material being transported in commerce occurs, the person transporting the material, immediately on request of appropriate emergency response authorities, shall disclose to the authorities information about the material." 49 U.S.C. § 5110(c).

The regulations relating to this portion of the HMTA further mandate, "A driver of a motor vehicle containing hazardous material, and each carrier using such a vehicle, shall ensure that the shipping paper required by this section is readily available to, and recognizable by, authorities in the event of accident or inspection." 49 C.F.R. § 177.817(e) (2024). Additionally, "Each person receiving a shipping paper required by this section must retain a copy or an electronic image thereof, that is accessible at or through its principal place of business and must make the shipping paper available, upon request, to an authorized official of a Federal, State, or local government agency at reasonable times and locations." *Id.* § 177.817(f).

Another regulation states that a shipping company must maintain "emergency response information" that is "immediately available to any person who, as a representative of a Federal, State or local government agency, responds to an incident involving a hazardous material, or is conducting an investigation which involves a hazardous material." 49 C.F.R. § 172.600(c)(2) (2024). "Emergency response information" includes the description and technical name of the hazardous material—formic acid in this case. 49 C.F.R. § 172.602(a)(1).

14

The appellants argue that they have been held liable for failing to voluntarily or proactively provide information about the hazardous materials without it having been requested. First, there was testimony from two first responders—Ponder and Goff—that they asked Foster whether the load contained hazardous material, and he said no. There was conflicting testimony that Foster was not asked about hazardous materials, and there was testimony about why Foster may have been too shaken up to answer accurately. However, there was substantial evidence presented at trial that appellants violated the precise language of 49 U.S.C. § 5110.

Arkansas appellate courts have not yet decided a case that examines preemption related to the HMTA. However, *Tipton v. CSX Transportation, Inc.*, Nos. 3:15-CV-311-TAV-CCS, -337-TAV-CCS, -497-TAV-CCS & -346-TAV-CCS, 2016 WL 11501426 (E.D. Tenn. July 7, 2016), is an unreported Tennessee federal district court case that analyzes the notification provisions of the HMTA and its regulations, and both parties discussed this case. It is certainly not binding authority, but *Tipton* is persuasive since it examines a situation very similar to the one at hand.

Although the plaintiffs in *Tipton* brought many more claims than the appellees in this case, the relevant claims involved some law enforcement officers and firefighters who sued a railroad company and a tank-car company after a derailment. The first responders claimed that they were exposed to hazardous chemicals for several hours while working on the scene of the accident but that the railroad company did not notify them of the identity of the hazardous materials. *Tipton*, 2016 WL 11501426, at *3. The district court first found that

15

the HMTA governed the notice claims and went on to note that the plaintiffs' complaint alleged that the railroad should have "immediately identified the toxic chemical involved in the derailment, and reported that identity to the emergency responders." *Id.* at \*14. This is precisely what the regulations require—that the shipping company maintain emergency-response information and make it "immediately available to any person who, as a representative of a Federal, State or local government agency, responds to an incident involving a hazardous material[.]" 49 C.F.R. § 172.600(c)(2).

The preemption clause in the HMTA notes that any state requirement must be "substantively the same as" those imposed by the HMTA and related regulations. 49 U.S.C. § 5125. A nonfederal requirement is "not substantively the same" unless it "conforms in every significant respect to the Federal requirement." *Roth v. Norfalco LLC*, 651 F.3d 367, 377 (3d Cir. 2011). In this case, the federal requirements were that a driver must notify first responders of the presence of hazardous materials when asked and that a carrier must have emergency-response information that is "immediately available" to emergency responders. When viewing the facts in the light most favorable to the appellees, a finding of negligence because emergency-response information was not provided for several hours is "substantively the same as" the HMTA.

For these reasons, we affirm the circuit court's denial of the appellants' motion for directed verdict on the issue of preemption.

## C. Professional-Rescuer's Doctrine

16

The appellants next argue that the circuit court erred when it did not grant them a directed verdict based on the professional-rescuer's doctrine.

The "fireman's rule" was first adopted in Arkansas in *Waggoner v. Troutman Oil Co.*, 320 Ark. 56, 894 S.W.2d 913 (1995). In *Waggoner*, the supreme court held that "a professional firefighter may not recover damages from a private party for injuries the fireman sustained during the course of putting out a fire even though the private party's negligence may have caused the fire and injury." *Id.* at 58, 894 S.W.2d at 914.

The supreme court later refined the doctrine in *Nowicki v. Pigue*, 2013 Ark. 499, 430 S.W.3d 765. In *Nowicki*, a semi-truck driver ran out of fuel, and his truck broke down in the left lane of an interstate near Tennessee. A Tennessee Department of Transportation ("TDOT") worker was killed in a traffic accident while assisting the driver, and his estate sued the semi-truck driver and other parties. The supreme court held that the TDOT worker's estate was precluded from recovery due to the professional-rescuer's doctrine. This was because assisting and protecting motorists, including those who had run out of fuel, was one of the job duties for TDOT workers. *Id.* at 8–9, 430 S.W.3d at 770–71. In so holding, the supreme court "decline[d] to apply a categorical rule but rather evaluate[d] the facts bearing on whether the worker was paid to assume the risk in question." *Id.* at 6, 430 S.W.3d at 769. It is clear, therefore, that the professional-rescuer's doctrine applies only if the appellants were paid to assume the risk of being exposed to hazardous materials.

The inquiry concerning the White Motor Company employees (Hunter, Bengi, Pettus, and Billingsley) is straightforward. Bengi testified that the accident would have been

17

cleaned up by a completely different company if the appellees had known there was hazardous material in the truck. They were not paid to assume the risk in question. Therefore, the professional-rescuer's doctrine does not apply to those appellees.

The law enforcement officers present a closer case, but viewing the evidence in the light most favorable to the winning party, we conclude that the professional-rescuer's doctrine does not apply to them.

McMillion is a sergeant with the Arkansas State Police who responded to the accident. He testified that he was trained to determine whether an eighteen-wheeler involved in an accident was carrying hazardous materials. If so, he would consult a booklet to determine what to do next. If he had looked up formic acid in the booklet, he would have gotten people away from the accident and set up a perimeter around it "so that we won't have any injury or death to occur from that chemical." McMillion testified that he is not qualified to do hazardous-materials cleanup or disposal. After establishing a perimeter, his next step, according to training, is to call an emergency manager to get a cleanup team to the site.

Allen Jones was a sergeant with the St. Francis County Sheriff's Department. He did not testify about his training or how he would handle hazardous materials, but Goff also worked for the St. Francis County Sheriff's Department. He testified that he was trained to ask eighteen-wheeler drivers if they were hauling hazardous materials on an accident scene. This was for "safety reasons," including the officer's safety. Goff testified multiple times that if he knew a truck involved in an accident was hauling hazardous materials, he would "back up" and call the fire department to avoid exposure to the hazardous materials. There was no

18

evidence presented at trial that the law enforcement officers were trained to clean up hazardous materials or that they were trained or expected to conduct an investigation in the presence of hazardous materials. The appellees' allegations were not that they experienced incidental contact with formic acid while clearing the scene of the accident but that they were exposed over multiple hours during an investigation of the accident site. Drawing all reasonable inferences in the light most favorable to the appellees, there was substantial evidence that the professional-rescuer's doctrine does not apply to McMillion or Jones.

Because the facts establish that the professional-rescuer's doctrine did not apply to any appellee, the circuit court did not err when it denied the appellants' directed-verdict motion.

## D. Jury Instructions

Appellants argue next that the judgment should be reversed because the circuit court denied their request to give two jury instructions—one containing the toxic-tort-causation standard and the other containing the professional-rescuer's-doctrine standard.

"[A] party is entitled to a jury instruction when it is a correct statement of the law, and there is some basis in the evidence to support giving the instruction." *Barnes v. Everett*, 351 Ark. 479, 492, 95 S.W.3d 740, 748 (2003). The standard of review for failing to give a proffered jury instruction is abuse of discretion. *Id.*

### 1. *Proximate causation*

The proffered instruction regarding proximate causation states:

19

Each Plaintiff must prove by a preponderance of the evidence: (1) that exposure to a certain minimum amount of formic acid for a certain period of time can cause their particular claimed injuries in the general population and (2) that his actual amount of exposure to formic acid in this case was at least equal to that minimum level and length of time.

As discussed above, the toxic-tort standard of causation does not apply to this case. Accordingly, the appellants were not entitled to this instruction because there could be no basis in the evidence to support it.

## 2. *Professional-rescuer's doctrine*

The proffered instruction regarding the professional-rescuer's doctrine states: "If you find that any one of the Plaintiffs was a first responder paid to respond to accidents such as the one at issue in this case, then you must find for the Defendants on the claims made by that particular Plaintiff."

The appellants also proffered interrogatories regarding the professional-rescuer's doctrine that the circuit court denied. There is one interrogatory for each appellee that states: "Do you find from a preponderance of the evidence that [Appellee] was a professional first responder at the time he claims to have been exposed to formic acid?" The set ended with the following instruction: "If you have answered each of the Interrogatories 1 through 6 "Yes," then please inform the Bailiff that your deliberations are complete and that you request to return to the Courtroom to deliver your verdict."

First, as discussed above, the appellees are not subject to the professional-rescuer's doctrine, so the appellants were not entitled to present these instructions to the jury.

20

Second, even if they were entitled to jury instructions on the professional-rescuer's doctrine, these instructions are not a correct statement of the law. To be precluded from receiving damages, *Nowicki* holds not only that the plaintiff must be a first responder, but also that the plaintiff be paid "to assume the risk in question." 2013 Ark. 499, at 6, 430 S.W.3d at 769. Just because the appellees were paid to respond to traffic accidents does not mean they were paid to clean up or investigate a scene where hazardous materials were present.

For these reasons, the circuit court did not abuse its discretion when denied the appellants' motion to give the proffered proximate-cause and professional-rescuer's doctrine jury instructions.

### E. Exclusion of Evidence Related to Ponder's Investigative File

The appellants next urge this court to reverse the circuit court because it erred in excluding evidence regarding Keith Ponder. At the time of trial, Ponder worked for the Arkansas State Parks and was in charge of the maintenance department. At the time of the accident, however, Ponder was a trooper for the Arkansas State Police who was dispatched to the scene. Ponder testified that he asked Foster if he was okay and then asked if he had hazardous materials on the truck. According to Ponder's testimony, Foster said there was no hazardous material on the truck or trailer.

There was testimony that contradicted Ponder's version of events. When Foster escaped from the burning truck, he found another Old Dominion driver happened to be driving by and stopped. Foster used the other driver's phone to talk to other employees at

21

Old Dominion and reported the accident. Foster testified that Ponder first approached him "and told me to get the 'F' off the phone[.]" He also testified that Ponder did not ask him about hazardous materials. Kristen Phagan heard the accident happen and witnessed the aftermath. She testified that she saw Ponder approach Foster and tell "him to get the F off the phone." She also said that she did not hear Ponder ask Foster whether he had hazardous materials on his trailer.

Importantly, another officer—Goff—testified that he asked Foster whether the truck was carrying hazardous materials and was told no.

Shortly after the accident in this case, Ponder was involved in an investigation by the Arkansas State Police, and he resigned after the investigation. The circuit court excluded the investigative file and would not allow the appellants to question Ponder about the information in it. The appellants argue that they should have been able to submit this evidence to the jury because it was relevant to Ponder's state of mind on the day of the accident and to his character for truthfulness.

The file is 183 pages long, and it contains reports and interview transcripts from the investigation after which Ponder resigned as well as information about other inquiries or disciplinary proceedings. The investigation after which he resigned never concluded with any official fact-finding and did not result in any criminal charges or convictions. The allegations in the investigation included that Ponder mishandled some drugs he used to train his K9, lied to his supervisor to get out of a work event, used his status as an officer to induce a judge

22

to reduce a friend's bond and later to induce the sheriff to release the friend on his own recognizance, and fled from an incident in which a friend called 911 from Ponder's house.

During the investigation and during his proffered testimony, Ponder admitted that it was part of his duties with the ASP to safeguard the drugs used for training his K9, but he denied that he stole or used the drugs. As to the second allegation, Ponder denied in both his proffered testimony and in the investigative file that he lied about his reason for needing to miss the work event, which was several days long. He told his supervisor that his mother was in bad health, and he needed to be close by. The investigation and his testimony revealed that he did stay in town, except for a two-and-a-half- to three-hour period one evening in which he went with friends to Memphis. As to the third situation, Ponder testified that his conversation with the judge started the investigation, and he admitted inappropriate conduct during the course of the investigation.

The allegation in the investigation regarding the 911 call is a bit more complex. The aforementioned Memphis trip was on the evening of April 24, which was a few days after the accident in this case. Ponder went to Memphis with his ex-wife and a friend named Josh Martir. Later that night, Martir called 911 from Ponder's residence, where he was staying because he had gotten very intoxicated while in Memphis. Martir said he was going to "blow his brains out." When the police arrived in response to Martir's 911 call, Ponder was not there because he had gone to his ex-wife's house nearby. Ponder was later asked by his supervisor and other officers why Martir was at his house. He told them that Martir had gotten into an argument with his wife and wanted to stay at Ponder's house, which was not

23

true. During the course of the investigation, Martir told officers that he and Ponder were romantically involved, and there was evidence that the two men were living together at the time of the ASP investigation. The investigators asked Ponder why he told his supervisor that Martir was at his house because of a fight with his wife, and he answered, "It, in my eyes it looked bad, so I, that's what I said . . . .I didn't tell the truth." He then admitted lying to his immediate supervisor and troop commander about the circumstances under which Martir was staying at his house.

After this portion of the interview in the investigative file, Ponder said that he had violated the following ASP policy:

> Employees shall not knowingly make an untrue statement to a supervisor or another employee which relates to the performance of any employee's official duties. Employees responding to superiors or to questions posed during formal or informal misconduct investigations should candidly and truthfully answer all questions related to the scope of employment and operations of the Arkansas State Police.

In their proffer, the appellants questioned Ponder superficially, asking him only if he remembered admitting to violating the policy above, and Ponder testified, "I don't recall that, no. I don't recall it." Further, during the proffered testimony, the appellants asked Ponder if he remembered saying the quote above that, "It, in my eyes, looked bad, so that's what I said. I didn't-I didn't tell the truth." Ponder said he did not remember saying that. Appellants then asked multiple times if Ponder told a lie when the truth made him look bad, and he consistently testified that he did not.

"We review evidentiary errors under an abuse-of-discretion standard, and the circuit court's findings will not be disturbed on appeal unless there has been a manifest abuse of discretion." *Potter v. Holmes*, 2020 Ark. App. 391, at 7, 609 S.W.3d 422, 427. Further, an evidentiary ruling does not warrant reversal without a showing of prejudice. *Id.* at 8, 609 S.W.3d at 428. The supreme court has held that it was not an abuse of discretion for a circuit court to exclude certain evidence to avoid a trial within a trial. *See Treadway v. State*, 287 Ark. 441, 700 S.W.2d 364 (1985).

### 1. *Rule 404*

Arkansas Rule of Evidence 404(a) states that evidence of a person's character is not admissible for the purpose of proving he acted in conformity therewith. However, character evidence may be "admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Ark. R. Evid. 404(b). Even if evidence is relevant under 404(b), the circuit court can exclude it "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ark. R. Evid. 403.

First, it was not an abuse of discretion for the circuit court to exclude the entire 183-page file, which is what the appellants proffered. The appellants themselves cite to fewer than 10 pages in the investigative file. The vast majority of the file was about issues that have nothing to do with state of mind or character for truthfulness. Instead, it was about the mishandling of drugs, questionable conduct with a judge and sheriff in a different situation,

25

and other unrelated matters. The investigative file is hearsay, and its probative value is far outweighed by the risk of confusion and undue delay.

Excluding the proffered testimony also was not a manifest abuse of discretion. The appellants argue that the investigation showed Ponder's state of mind on the day of the accident because earlier that day, he asked and received permission to be excused from a work event to care for his mother. There was no evidence during the investigation or during the trial, including during the proffer, that Ponder was distracted, even if there was testimony that he was rude to Foster. It was not a manifest abuse of discretion for the circuit court to find that this was not proof of Ponder's mindset on the day of the accident.

It was also not a manifest abuse of discretion for the circuit court to exclude the proffered testimony because it does not show a "common scheme" of lying. First, Ponder denied in both his proffered testimony and in the investigative file that he lied about his reason for needing to miss the work event, which was several days long. He told his supervisor that his mother was in bad health, and he needed to be close by. The investigation and his testimony revealed that he did stay in town, except for a two-and-a-half- to three-hour period one evening in which he went with friends to Memphis. Neither the investigation nor his proffered testimony established that Ponder lied to his supervisors about needing to care for his mother during a multiple-day out-of-town work event.

The appellants argue that Ponder stated in the investigative file that he lies when the truth makes him look bad. In the proffered testimony, the appellants ask Ponder several times generally whether he lies to supervisors and others if the truth makes him look bad.

26

He said no each time. That testimony was consistent with the evidence in the investigation. Two pages of the file establish that Ponder admitted lying about why Martir was at his house on the night of the 911 call. Ponder did not say the truth would have made him look bad; instead, he said that the situation looked bad. Further, one lie about why a person was at his house (days after the accident) does not establish a broad scheme of lying about other aspects of his life or work.

Establishing the context of Ponder's statement and explaining the investigation could have taken a significant amount of time in an already lengthy and complex jury trial. Allowing this line of questioning would have been confusing and led to undue delay, both of which substantially outweigh the probative value of the proffered testimony.

Even if it were not confusing, the appellants have not made any showing of prejudice caused by the exclusion because a different law enforcement officer gave similar testimony, and the record shows a great deal of evidence that Old Dominion was aware of the accident but did not notify anyone at the scene that there were hazardous materials involved.

### 2. *Rule 608*

The appellants next argue that the investigation file should have been admitted under Arkansas Rule of Evidence 608, which states:

> (a) *Opinion and Reputation Evidence of Character*. The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

(b) *Specific Instances of Conduct*. Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

When determining whether evidence is admissible under Rule 608, the circuit court must satisfy three factors: "(1) the question must be asked in good faith; (2) the probative value must outweigh its prejudicial effect; and (3) the prior conduct must relate to the witness's truthfulness." *Hill v. State*, 54 Ark. App. 380, 382, 927 S.W.2d 820, 822 (1996). Again, relevant evidence can be excluded under Rule 403 "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

No one has claimed that the appellants were acting in bad faith with their proffer, so we move to the second factor—whether the probative value outweighs the prejudicial effect. As to the investigation file, it contained a great deal of information that had nothing to do with Ponder's character for truthfulness. Only one or two pages may have had any probative value, but that is far outweighed by the confusion and undue delay related to the remaining documents in the file. As to the proffered testimony, there was very little probative value because Ponder denied the allegations that he lied. Further, there was evidence from other

witnesses that established the same fact that Ponder testified to, as well as other evidence that established Old Dominion's liability.

As to the third element—whether the prior conduct relates to Ponder's truthfulness, the appellants argue that this case is exactly the same as *Hill*, 54 Ark. App. 380, 927 S.W.2d 820. We disagree. In *Hill*, a person was convicted of selling drugs. The witness who purchased the drugs was an undercover officer at the time of purchase, but he later left the police force after filing a false police report and giving a false statement regarding his vehicle being stolen. *Id.* at 381–82, 927 S.W.2d at 821. He was the only witness who proved the sale. The circuit court prohibited any mention of why the witness left the police force. *Id.* at 382, 927 S.W.2d at 822.

In determining whether the false report and false statement were admissible under Rule 608, this court noted, "[I]t is without question that these instances of misconduct are related to the witness's veracity, and were thus probative of his capacity for truthfulness as required by the rule." *Id.* at 382–83, 927 S.W.2d at 822.

As discussed above, it is not "without question" here that the file and the proffered testimony are related to Ponder's veracity. Unlike in *Hill*, it is not even clear from the investigative file that the reason Ponder resigned was due to the lie he told about why Martir was at his house because he admitted he had violated many other policies that had nothing to do with a character for truthfulness.

This is an evidentiary issue that is left to the discretion of the circuit court. Further, "[a] circuit court has wide latitude to impose reasonable limits on cross-examination based

on concerns over confusion of the issues." *Cantrell v. Toyota Motor Corp.*, 2018 Ark. App. 335, at 16, 553 S.W.3d 157, 168.

The circuit court did not manifestly abuse its discretion when it excluded the appellants' proffered exhibit and testimony regarding Ponder.

## F. Motion for a New Jury Pool

At the time of trial, Jeff Goff was a sergeant with the St. Francis County Sheriff's Office. Judge Wilson does not have a single bailiff who serves in each courthouse. Instead, when he presides over cases in St. Francis County, the St. Francis County Sheriff's Office appoints an officer to serve as bailiff in that particular court. Goff assisted Judge Wilson as bailiff during some trials during the tenure of the jury pool for this case. The record is silent as to how many days Goff served as bailiff, whether other officers served, and exactly how much contact Goff had with any potential jurors during that period.

At the pretrial hearing, Judge Wilson clarified that Goff would not be serving as bailiff in the trial in this case. The appellants argue that the entire jury pool was tainted by Goff's service, regardless of whether he served as the bailiff during the actual trial, and that the circuit court committed reversible error when it denied their motion to empanel a new jury pool. They claim that the jury's previous interactions with Goff as a courtroom officer would cause the jury to give his testimony as a witness to the aftermath of the accident undue weight.

During voir dire, appellants' counsel asked the potential jurors whether they remembered having interactions with Goff as a bailiff during their time in the jury pool,

beginning in August or September (this trial was in December). Counsel also questioned each person who had already served on a jury about his or her interactions with Goff. Of those, four served as jurors in this trial. Those jurors stated during voir dire that Goff had no significant interactions with them beyond his opening doors, making sure they had what they needed, and making brief small talk. Appellants' attorney also asked the panel, "Is there anything about your experience with Mr. Goff that would lead you to believe he is more trustworthy than the average person such as Mr. Foster, a truck driver?" The jurors answered no. The appellants also emphasize that they do not believe any misconduct occurred during this trial regarding Goff, but the fact that he previously served as bailiff for the panel gave an appearance of impropriety. The appellants did not ask the circuit court to strike for cause the four jurors who had actually served on a jury while Goff was bailiff. The only remedy they sought was to empanel an entirely new jury pool.

There are United States Supreme Court cases in which a bailiff testified as a witness during a criminal trial for which the bailiff was serving. *See Turner v. State of Louisiana*, 379 U.S. 466 (1965); *Gonzales v. Beto*, 405 U.S. 1052 (1972). In those cases, the Supreme Court found reversible error. This case is different for several reasons. First, this is a civil matter rather than a criminal matter. Also, Goff was not a key witness because another witness testified to the same thing he did. Further, he did not serve as a bailiff during the trial.

The supreme court of this state has noted that "[b]ecause of the close relationship between the bailiff and the court itself[,] any action on the part of the bailiff concerning the jury should be subject to close scrutiny by the court." *Lewis v. Pearson*, 262 Ark. 350, 354,

556 S.W.2d 661, 664 (1977). In *Lewis*, the supreme court held that the bailiff's racist comment to a juror "was such that the possibility of prejudice was so great that the entire deliberations were tainted." *Id.*

In *Garcia-Chicol v. State*, 2020 Ark. 148, 597 S.W.3d 631, the supreme court analyzed a situation in which the bailiff instructed the jury foreman to sign the wrong form. In that case, the jurors told the bailiff they had reached a verdict in a rape case. There were two verdict forms—one for rape and one for attempted rape. Although the jury had reached a unanimous verdict on the rape charge, the foreman asked the bailiff what to do with the attempted-rape form. The bailiff instructed the foreman to sign the form but did not instruct him whether to mark it "guilty" or "not guilty." *Id.* at 3-4, 597 S.W.3d at 634–35. The supreme court held that the bailiff's erroneous instruction "could not have infected the jury's deliberations" because it was given after they had reached a verdict. *Id.* at 6, 597 S.W.3d at 635.

In another case, the supreme court considered whether extraneous information discussed about one of the trial lawyers was prejudicial. The supreme court noted in its analysis that "this court has shown a reluctance to invade the sanctity of the jury room in order to impeach a jury's verdict." *Watkins v. Taylor Seed Farms, Inc.*, 295 Ark. 291, 293, 748 S.W.2d 143, 144 (1988). The supreme court in that case also found it significant that the extraneous information was a matter that concerned the litigants themselves. *Id.* at 294, 748 S.W.2d at 145. Further, Arkansas Rule of Evidence 606(b) "ensures that jury deliberations

should remain secret, unless it becomes clear that the jury's verdict was tainted by a showing of extraneous prejudicial information or some improper outside influence." *Id.*

It is important to note that the appellants in this case have not alleged any actual misconduct by the circuit court or by Goff. They also have not pointed to any evidence that Goff's previous interactions with the jury pool improperly influenced deliberations. In fact, when asked whether their previous interactions would influence their view of Goff's testimony, the jurors responded that they would not. Appellants' attorney objected several times to Goff's testimony that was speculative or otherwise inadmissible, and most of those objections were sustained, demonstrating that the circuit court did not give Goff special treatment in front of the jury. Appellants' attorney cross-examined Goff by reading inconsistent statements from his deposition and by questioning him about whether the person he talked to at the scene was actually Foster. He also elicited testimony that Goff was friends with one of the appellees, which could have been another attempt to impeach Goff's credibility.

Although it is true that some members of the jury had contact with Goff before this trial when they were serving for different matters, there is no evidence that those interactions influenced their deliberations any more than the fact that he was a law enforcement officer, that he made inconsistent statements in his deposition, that he was friends with an appellee, or any of the other ways a jury determines credibility. The record was not developed regarding how many other officers served as bailiffs for the jury pool or exactly how much contact the jurors had with Goff, specifically. Further, the appellants did not seek a less

drastic remedy by arguing to the circuit court that only the jurors who had served before with Goff should have been excused for cause. On these specific facts, we hold that the circuit court did not err when it denied appellants' motion to empanel a new jury pool.

## G. Admissibility of Expert Testimony

The appellants' next argument is that the circuit court erred when it did not exclude or limit the testimony of the appellees' experts. The admission of expert testimony is reviewed under an abuse-of-discretion standard. *Green*, 373 Ark. at 397, 284 S.W.3d at 43. "To have abused its discretion, the circuit court not only must have made an error in its decision, but also must have acted improvidently, thoughtlessly, or without due consideration." *Corbin v. Baptist Health, Inc.*, 2016 Ark. App. 212, at 3, 490 S.W.3d 317, 319.

The admissibility of expert testimony is governed by Arkansas Rule of Evidence 702, which states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

### 1. *Robert Richard*

Richard is a hazardous materials transportation expert who testified at trial about the requirements of the HMTA and testified that the appellants violated those laws. The appellants argue that Richard explained and interpreted the law for the jury, which they contend is reversible error.

As an initial note, the circuit court did limit Richard's testimony. The order regarding the motion to exclude or limit stated, "Robert Richard shall not instruct a juror on whether a party was or was not negligent. Robert Richard shall not opine directly on the credibility of any witness. Robert Richard shall not opine on any area outside of his expertise."

Further, the jury instructions contained some of the applicable regulations and stated, "A violation of these regulations, although not necessarily negligence, is evidence of negligence to be considered by you along with all of the other facts and circumstances in the case." The jury is presumed to follow the instructions. *KW-DW Props.*, 2019 Ark. 95, at 6, 571 S.W.3d at 9.

The appellants never objected that Richard exceeded the limits set by the circuit court. Additionally, the appellants did not object to the demonstrative aids shown to the jury that apparently showed the regulations, and those aids were not included in the record for this court to review. Therefore, to the extent the appellants' arguments rely on the demonstrative aids, that issue is not preserved.

To the extent the issue is preserved, the supreme court has held that a witness can testify to "evidence of standards[.]" *Rhine v. Haley*, 238 Ark. 72, 82, 378 S.W.2d 655, 661 (1964). In *Rhine*, an attorney testified during a legal-malpractice case about "what ordinarily careful and prudent practitioners in the Greene County area would have done under the same or similar circumstances." *Id.* This is similar to what Richard testified about. He testified about the regulations and how the appellants could have satisfied the standards. Again, the jury instructions stated that a violation of the regulations or statutes was "not

necessarily negligence," and the jury is assumed to have followed the jury instructions. As in *Rhine*, Richard's testimony "was for the purpose of furnishing the jury with a guide and a standard by which to measure appellant's conduct under the circumstances in determining the ultimate issue of whether appellant was or was not negligent." *Id.* at 83, 378 S.W.2d at 662.

Given these factors, the circuit court did not act improvidently, thoughtlessly, or without due consideration or abuse its discretion in allowing Richard to testify within the limitations set in its order.

## 2. *David Dorrity*

The appellants next urge us to reverse the judgment because the circuit court allowed David Dorrity to testify at trial as a trucking-safety expert. They argue that Dorrity's testimony concerned matters that were within the common understanding of the jury and were therefore not helpful to the jury.

This court has held that expert testimony that does not help the jury is inadmissible. *See Bedell v. Williams*, 2012 Ark. 75, at 14–15, 386 S.W.3d 493, 503. Expert testimony about matters within the jury's common knowledge is not helpful. *See id.*

The circuit court properly denied the motion to exclude Dorrity's testimony. In their expert disclosure, the appellees stated that Dorrity would testify about Old Dominion's failure to train certain employees about how to read certain documents and how to appropriately respond after accidents involving hazardous materials as well as its failure to develop a system for communicating about hazardous materials. Developing, disseminating,

36

and implementing safety procedures at a trucking company is the type of subject matter that is not within the common understanding of a juror, and therefore, expert testimony would be beneficial.

Dorrity's actual testimony was considerably less technical than the disclosures indicated, but it did concern developing and implementing systems to respond to accidents involving hazardous materials. At any rate, the appellants did not object during Dorrity's testimony, nor did they object that he was testifying about matters outside the scope of the appellees' disclosure.

The circuit court did not abuse its discretion by denying the appellants' motion to exclude Dorrity's testimony.

### 3. *Scott Manaker*

Finally, the appellants argue that the circuit court erred when it denied their motion to exclude the opinions of Dr. Manaker, who was the appellees' pulmonologist. He testified at trial about the appellees' injuries.

In determining whether to allow an expert to testify, "the trial court must make a preliminary assessment of whether the reasoning or methodology underlying expert testimony is valid and whether the reasoning and methodology used by the expert has been properly applied to the facts in the case." *Green*, 373 Ark. at 399, 284 S.W.3d at 45. This assessment is necessary because it ensures the reliability and relevancy of the expert's testimony. *Id.*

Dr. Manaker is a board-certified pulmonologist who has worked with patients with all types of lung disease, including patients who have been exposed to acids and other hazardous materials. He based his opinions on all this experience. Dr. Manaker conducted various lung-function tests on the appellees and personally examined each one. He also reviewed their medical records and researched information about formic acid, specifically, in forming opinions about the appellees. Dr. Manaker admitted that many of his opinions were not based on peer-reviewed studies involving formic acid, but that is because there is a "paucity" of studies on that specific acid. Instead, he testified about how patients are affected by similar acids.

The appellants also argue that a medical expert must consider differential etiology for the expert's testimony to be admissible. It is true that this court considered this factor in *Richardson* in determining that an expert's exclusion was not an abuse of discretion. *See* 2011 Ark. App. 562, at 4, 386 S.W.3d at 80. However, Dr. Manaker did consider differential etiologies in this case. He testified about why he believed the formic acid was the cause of the appellees' injuries rather than obesity, smoking, or preexisting conditions.

The appellants also argue that Dr. Manaker is engaging in a *post hoc, ergo propter hoc* fallacy—in other words, testifying that the appellees' injuries were a result of the formic-acid exposure simply because the symptoms occurred after the exposure. "This fallacy confuses sequence with consequence, and assumes a false connection between causation and temporal sequence. Post hoc ergo propter hoc is not sound as either evidence or argument." *Schmoll v. Hartford Cas. Ins. Co.*, 104 Ark. App. 215, 220, 290 S.W.3d 41, 45 (2008).

We disagree that Dr. Manaker engaged in this type of logic. He testified that he had examined the appellees, performed medical tests on them, and reviewed their medical records. Although he testified that he had not seen any scientific studies linking the appellees' medical injuries to formic acid, he did testify about how the exposure would have caused the appellees' injuries. He testified that RADS, exacerbation of COPD, asthma, and rhinosinusitis can all be caused by exposure to corrosive acids. He also testified that exacerbation of coronary artery disease is caused by the stress, which was induced by the incident. He testified that GERD could be caused by swallowing particles of formic acid that had vaporized. He also explained to the jury why he thought certain conditions worsened at an accelerated rate due to the exposure.

Given all of this, the circuit court did not abuse its discretion in allowing the testimony of Dr. Manaker to proceed.

## H. Other Evidentiary Issues

The appellants argue that the circuit court committed reversible error on two additional evidentiary issues: (1) in refusing to admit the appellees' medical bills and (2) in admitting hearsay testimony from a nonparty witness.

As noted above, "[w]e review evidentiary errors under an abuse-of-discretion standard, and the circuit court's findings will not be disturbed on appeal unless there has been a manifest abuse of discretion." *Potter v. Holmes*, 2020 Ark. App. 391, at 7, 609 S.W.3d 422, 427. Further, an evidentiary ruling does not warrant reversal without a showing of prejudice. *Id.* at 8, 609 S.W.3d at 428.

## 1. *Medical bills*

The appellants argue that the circuit court committed reversible error when it excluded the appellees' medical bills.

At trial, the appellees did not seek to recover for their medical bills. Instead, they sought damages for (1) "the nature, extent, duration, and permanency of any injury and whether it is temporary or permanent" and (2) "[a]ny pain and suffering and mental anguish experienced in the past and reasonably certain to be experienced in the future."

In a pretrial hearing, the circuit court granted the appellees' motion to exclude their medical bills. However, as the trial progressed, the circuit court reconsidered that ruling and amended it. During McMillion's testimony, the circuit court stated that the appellees' medical bills would not be admissible unless they brought up their medical treatment. If that happened, the circuit court would entertain a motion from the appellants to admit that particular appellee's medical bills. McMillion was the first appellee to testify, and although he spoke about his treatment on direct examination, the appellants did not ask the circuit court to admit McMillion's medical bills. Jones's wife testified about his treatment, and again, the appellants did not ask the circuit court to admit Jones's medical bills. Bengi Bokker did not testify about his treatment. The appellants also did not proffer the medical bills for these three appellees after the circuit court amended its ruling.

By the end of trial, the appellants had successfully moved to admit the bills for Hunter Bokker, Carl Pettus, and Zack Billingsley and argued in closing about their low amounts.

Even though the appellees did not ask the jury for economic damages related to their medical bills, the appellants contend the bills were relevant to all of the appellees because the bills could be used to show that the appellees' injuries were limited.

The failure to raise an issue to the circuit court is fatal to our consideration of that issue on appeal. *Brown v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 67, at 5, 511 S.W.3d 895, 899. The circuit court changed its ruling regarding the medical records during the first appellee's testimony. Despite that, and despite McMillion's and Jones's wife's testimony about their medical treatment, the appellants never moved to admit those appellees' medical bills. The issue is not preserved as to McMillion and Jones.

The appellants also never proffered those bills. "To challenge a ruling excluding evidence, an appellant must proffer the excluded evidence so the appellate court can review the decision, unless the substance of the evidence is apparent from the context." *Id.* at 7, 511 S.W.3d at 900. In this case, the content of the bills is not apparent from the context. The appellants wanted to argue in closing that low medical bills should be correlated to a certain recovery for pain and suffering. Although the appellants made that argument regarding three of the appellees, we do not know whether McMillion, Jones, and Bengi had bills that were similar to the other appellees' or had bills that were much higher. We are precluded from reviewing this evidence on appeal because it was not proffered, and the appellants cannot demonstrate prejudice. *See id.*

The circuit court's exclusion of the medical bills for certain appellees is affirmed.

*2. Thereasa May's testimony*

41

At trial, Thereasa May, an employee of White Motor Company, testified that she called Old Dominion to ask for the bills of lading, and she did not receive them. Although she did not know who she spoke to, she testified that she called the number for Old Dominion that she was given by FleetNet, which is the company that dispatched White Motor Company on behalf of Old Dominion. May also testified that she felt as if the person who answered the phone did not think May knew what she was talking about because May is a woman. May further testified that her coworker, Kendall Pettus, was able to obtain the bills of lading, which was the first time White Motor Company was made aware of the hazardous materials. Pettus received the bills of lading within five minutes of calling Old Dominion.

The appellants argue that this was inadmissible hearsay. We disagree. First, May never testified about anything that the operator said to her—only how she felt and whether she received the bills of lading. There is no specific statement to which the appellants are objecting, and a statement is not hearsay if it is not offered for the truth of the matter asserted. *See* Ark. R. Evid. 801(c).

Even if there were a specific statement being offered for the truth of the matter asserted, the appellants have not shown how they were prejudiced. May's testimony was extremely short. Many other witnesses testified that they sought information about hazardous materials. Even admitting improper hearsay evidence is harmless error "if the same or similar evidence is otherwise introduced at trial." *Builders Transp. Co. v. Smith*, 2024 Ark. App. 561, at 13–14, 701 S.W.3d 22, 32. Further, May testified that White Motor Company

received the information shortly after her co-worker had asked. The exact time White Motor Company received the bill of lading was not contested.

Admitting May's testimony was not an abuse of discretion for the reasons listed above, but even if it were, the appellants have not shown any prejudice. The circuit court's order is affirmed on this point.

## I. Use of Shadow Jury

The fact that appellees employed a shadow jury during trial is not contested. From the record, it appears that on day six of the trial, the circuit court noticed a disturbance in the gallery, asked the parties to stop a video deposition that was playing, and took a matter up in chambers. After the meeting in chambers, the appellants moved for a mistrial based on the presence of the shadow jury. The circuit court stated on the record that it had begun to notice unusual behavior the previous day and said:

> I started seeing papers handed out in the audience going from one person to another, going from one person to another. And I really didn't know what it was. It concerned me, but not to the point of bringing it up. And then again, I saw it here again this morning, happening again. Paper going from one person to another being passed around, passed around, passed around. And so it concerned me because this is a case that's been going on for a while, and I just wanted to make sure about what was going on in the audience in my courtroom. And it was sort of distracting for the court because the paperwork would go from one person, then it would be passed over to another person, then it would get up and move across the bench to another person. And so that's when I called a recess today, brought the attorneys in the back, had the bailiff secure what the paper was, and it was at that time that I was informed that it was the lunch menu being passed around for paid jurors that have been paid to sit in this case to offer feedback or whatever to the plaintiffs' attorneys.

The circuit court reprimanded the appellees' counsel for failing to disclose the presence of the shadow jury before this disturbance and denied the appellants' motion for mistrial.

After the circuit court denied the motion for mistrial, the appellants made the following request:

> When you go back on the record to our actual jury, I'm sure that it appears that something was going on. We were right in the middle of an answer from the witness. I ask the court to give an instruction that it had nothing to do with that witness's answer, question and answer, number one, and number two, that we go back to the question and start with the question if that's okay.

The circuit court then recessed for lunch, after which, the following exchange took place:

THE COURT: Ladies and Gentlemen, before we took the last break, I took a recess during the testimony. The break had to deal with some external issues I had to deal with. It had nothing to do with the testimony or what was going on on the screen. Okay. All right?

JURY: Yes, sir.

THE COURT: At this time, we're back on the record. The defense may continue with their witness.

MR. WYATT: Your honor, with the court's permission, we would like to start with Mr. Dirks on the last question that was stopped right in the middle of the question.

THE COURT: Yes, sir.

MR. WYATT: Okay. Thank you.

On appeal, the appellants argue that the circuit court should have granted its motion for mistrial or, in the alternative, informed the jury of the shadow jury.

44

A mistrial is "a drastic and extreme remedy that should be granted only when there has been error so prejudicial that justice cannot be served by continuing the trial or when fundamental fairness of the trial itself has been manifestly affected." *Madden v. Aldrich*, 346 Ark. 405, 424, 58 S.W.3d 342, 356 (2001). We will not reverse the denial of a mistrial motion absent an abuse of discretion or manifest prejudice to the movant. *Id.* Further, a mistrial is only appropriate where any possible prejudice could be removed by an admonition to the jury. *Id.* The failure to request an admonition negates a mistrial motion. *Id.*

Here, the appellants requested an admonition. They received it. The circuit court instructed the jury that the meeting in chambers was about "external issues" that "had nothing to do with the testimony or what was going on[,] on the screen." The appellants do not offer any argument or evidence that the fundamental fairness of the trial was impacted in a way that was not removed by this instruction.

To the extent the appellants argue the circuit court should have admonished the jury differently, the appellants did not request a different admonition.

The circuit court did not abuse its discretion, and no manifest prejudice has been shown. The circuit court's denial of the motion for mistrial is affirmed.

### J. Bifurcation of Liability for Punitive Damages

Arkansas Rule of Civil Procedure 42(b)(2) states,

[A]ll actions tried before a jury in which punitive damages are sought shall, on the motion of any party and if warranted by the evidence, be conducted in a bifurcated trial before the same jury. The jury shall first determine the liability of the defendant or defendants for compensatory damages, the amount of compensatory damages to be awarded, and, at the discretion of the circuit

45

court, the liability of the defendant or defendants for punitive damages. Should it be necessary, the jury will then determine in a separate proceeding, the liability of the defendant or defendants for punitive damages, if that issue was not decided previously, and the amount of punitive damages to be awarded.

Here, the circuit court bifurcated the trial, allowing the jury to decide all issues regarding compensatory damages in phase one of the trial in addition to liability for punitive damages. If the jury had found the appellants liable for punitive damages, then the jury would determine the amount of punitive damages in phase two of the trial. At the conclusion of phase one, the jury found that the appellants were not liable for punitive damages, so phase two was not necessary.

The appellants argue that the circuit court erred when it allowed the jury to determine punitive-damages liability in phase one of the trial. They argue that Arkansas Code Annotated § 16-55-211 requires that all issues related to punitive damages be "completely bifurcated."

That is not what the statute mandates:

(a)(1) In any case in which punitive damages are sought, any party may request a bifurcated proceeding at least ten (10) days prior to trial.

(2) If a bifurcated proceeding has been requested by either party, then:

(A) The finder of fact first shall determine whether compensatory damages are to be awarded; and

(B) After a compensatory damages award determination, the finder of fact then shall determine whether and in what amount punitive damages will be awarded.

(b) Evidence of the financial condition of the defendant and other evidence relevant *only* to punitive damages is not admissible with regard to any compensatory damages determination.

Ark. Code Ann. § 16-55-211 (Repl. 2005) (emphasis added). The statutory arguments are not preserved. We do not consider arguments that were not raised below or ruled upon by the circuit court. *Wilson v. Neal*, 332 Ark. 148, 154, 964 S.W.2d 199, 202 (1998). During the pretrial hearing, the appellants made arguments about Arkansas Rule of Civil Procedure 42 and their experience in other courts but did not address the statute above.

Arkansas Rule of Civil Procedure 42 specifically allows the circuit court to combine the compensatory and punitive-liability stages. This court will not reverse a circuit court's decision regarding bifurcation absent an abuse of discretion. *Ciba-Geigy Corp. v. Alter*, 309 Ark. 426, 436, 834 S.W.2d 136, 141 (1992). "The purpose of Rule 42(b) is to further convenience, avoid delay and prejudice, and serve the needs of justice. The primary concern is efficient judicial administration, as long as no party suffers prejudice by the bifurcation." *Id.*

During the pretrial hearing, appellants stated, "We agree that the facts will be the same to prove compensatory damages and punitive damages. There's not going to be more facts introduced in the second trial. . . . The jury heard all the facts of negligence and the alleged facts of recklessness during the first trial. They remember that." They noted that they were seeking bifurcation about "the arguments in the second trial on the issue of punitive damages." The appellants contend that the appellees' arguments during opening statements and their questions regarding deterring behavior prejudiced phase one of the trial and placed

47

"undue emphasis on the need to penalize" them. However, because Rule 42 specifically allows this approach and because the appellants agreed below that the same facts would be used to prove compensatory and punitive liability, we hold that the circuit court did not abuse its discretion.

K. Use of the Reptile Theory

The Reptile Theory as it relates to lawsuits was popularized by David Ball and Don Keenan in their book, *Reptile: The 2009 Manual of the Plaintiff's Revolution*. Louis J. Sirico, Jr., *The Trial Lawyer and the Reptilian Brain: A Critique*, 65 Clev. St. L. Rev. 411, 412–13 (2017). The authors use neurobiology developed in the 1960s positing that the human brain consists of three parts: the reptilian brain, the limbic system, and the neocortex. *Id.* at 414. According to this theory, the limbic system responds to emotion and memory, while the neocortex promotes reflection and rationality. *Id.* The reptilian portion of the brain, on the other hand, controls autonomic functions and "the fight or flight response and controls other mainly hard-wired ritualistic or instinctive behavior." *Id.* Although this "tri-une brain" theory is no longer within the mainstream of neurobiology, it forms the center of the trial strategy advanced by Ball and Keenan. *Id.* at 416. At a high level, the strategy involves tapping into the "reptilian brain" of the jurors because

> if the lawyer can show that community safety equates with justice, and that justice lies with the lawyer's argument, the lawyer can successfully appeal to the reptile brain: "This gives us our primary goal in trial: To show the immediate danger of the kind of thing the defendant did—and how fair compensation can diminish that danger within the community."

*Id.* at 417 (quoting David Ball and Don C. Keenan, *Reptile: The 2009 Manual of the Plaintiff's Revolution*, at 30 (2009)).

The appellants filed a motion in limine asking the circuit court to prevent the appellees from using the Reptile Theory, arguing that the strategy involves the use of Golden Rule arguments and imposes a duty different than that stated in the law. The circuit court granted the motion in part and denied it in part, ruling: "There shall be no inappropriate golden rule arguments; that plaintiff shall be allowed to use any trial strategy, including reptile arguments or any other strategy that does not offend the rules of evidence and rules of civil procedure[.]" The appellants argue this was reversible error. We disagree.

Because the motion in limine asked the circuit court to exclude certain types of evidence and arguments, we do not reverse absent a manifest abuse of discretion. *See Potter*, 2020 Ark. App. 391, at 7, 609 S.W.3d at 427.

Here, the circuit court properly excluded Golden Rule arguments. Indeed, the appellants objected to Golden Rule testimony during the trial, and those objections were sustained.

The order regarding the motion in limine also allowed arguments and evidence that did not "offend the rules of evidence and rules of civil procedure." It is true that once a motion in limine "to specific evidence" has been denied, the objection is preserved. *Schichtl v. Slack*, 293 Ark. 281, 285, 737 S.W.2d 628, 630 (1987). A motion in limine is used "to prevent some specific matter, perhaps inflammatory, from being interjected prior to the trial court's having decided on its admissibility outside the hearing of the jury." *Id.* The order here

49

excluded specific evidence and argument (Golden Rule arguments) but allowed any other specific evidence or argument that did not "offend" the Rules.

To the extent the appellants now argue that specific testimony or argument violated the Arkansas Rules of Civil Procedure or the Arkansas Rules of Evidence, they did not object to that specific testimony or argument during trial, and their arguments are not preserved. The circuit court had no opportunity to rule on the allegedly offending testimony or arguments; accordingly, this court has nothing to review. *See Platinum Peaks, Inc. v. Bradford*, 2015 Ark. App. 548, at 10, 473 S.W.3d 70, 76 (holding that a general objection to a jury instruction was not sufficient to preserve the issue for appeal).

Further, the jury was instructed on the applicable law, and the jury is presumed to have followed those instructions. *KW-DW Props.*, 2019 Ark. 95, at 6, 571 S.W.3d at 9.

For these reasons, we hold that the circuit court did not abuse its discretion.

## L. Motion for New Trial or Remittitur

The appellants' final argument on appeal is that the circuit court erred in denying their motion for new trial or remittitur.

The appellants argue that they are entitled to a new trial pursuant to Arkansas Rule of Civil Procedure 59(a)(4)–(5), which states:

> A new trial may be granted to all or any of the parties and on all or part of the claim on the application of the party aggrieved, for any of the following grounds materially affecting the substantial rights of such party: . . . (4) excessive damages appearing to have been given under the influence of passion or prejudice; [or] (5) error in the assessment of the amount of recovery, whether too large or too small[.]

Here, the appellants filed a timely motion for new trial or remittitur. The circuit court never ruled on that motion, so it was deemed denied pursuant to Arkansas Rule of Civil Procedure 59(b).

We review the denial of a motion for new trial for abuse of discretion. *Koch v. Northport Health Servs. of Ark., LLC*, 361 Ark. 192, 196, 205 S.W.3d 754, 758 (2005). This is true whether the circuit court denied the motion through an order or if it was deemed denied through the operation of Rule 59(b). *See id.* (stating abuse-of-discretion standard even though the motion for new trial was deemed denied through operation of Rule 59(b)).

When an appellant argues that the amount of damages is excessive, "this court reviews the proof and all reasonable inferences most favorably to the appellee and determines whether the verdict is so great as to shock the conscience of the court or demonstrates passion or prejudice on the part of the jury." *Vaccaro Lumber v. Fesperman*, 100 Ark. App. 267, 269, 267 S.W.3d 619, 621 (2007).

Whether a verdict shocks the conscience or demonstrates passion or prejudice is determined on a case-by-case basis. *Id.* at 269, 267 S.W.3d at 622. This court considers elements that include "past and future medical expenses, permanent injury, loss of earning capacity, scars resulting in disfigurement, and pain, suffering, and mental anguish." *Id.*

The verdict in *Vaccaro* was $50,000. It was supported by evidence establishing approximately $5,500 in medical expenses and lost wages. This meant the remaining $44,500 was apparently awarded to compensate the plaintiff for future medical expenses or pain and suffering. *Id.* at 271, 267 S.W.3d at 623. The case was remanded for a new trial and remittitur

because the plaintiff's evidence did not support the damages awarded, and the "amount [was] sufficiently excessive in relation to the evidence presented at trial that it shock[ed] the conscious of the appellate court[.]" *Id.* This is because "[a] damages award is not a lottery ticket[.]" *Id.* The plaintiff in *Vaccaro* testified that she had back pain almost every day since the accident but that she carried on with her normal activities. She also said she was not taking medication for her pain and had not seen a doctor for the pain since a few months after the accident. *Id.*

The appellants also moved for remittitur. "Remittitur is appropriate when the compensatory damages awarded are excessive and cannot be sustained by the evidence. The standard of review in such a case is whether there is substantial evidence to support the verdict." *Id.* at 269, 267 S.W.3d at 621.

A seminal case regarding remittitur in a case for pain and suffering is *Advocat, Inc. v. Sauer*, 353 Ark. 29, 111 S.W.3d 346 (2003). In *Advocat*, the supreme court noted:

> [T]here is no definite and satisfactory rule to measure compensation for pain and suffering; the amount of damages must depend on the circumstances of each particular case. Additionally, we have held that compensation for pain and suffering must be left to the sound discretion of the jury and the conclusion reached by it should not be disturbed unless the award is clearly excessive.

*Id.* at 44–45, 111 S.W.3d at 354. The supreme court went on to hold that a compensatory-damages award of $15 million for pain and suffering caused to a woman who died in the care of a nursing home "shocked the conscience." *Id.* at 48, 111 S.W.3d at 356. Holding that the circuit court abused its discretion by not granting a new trial based on excessive damages

or by ordering a remittitur of damages, the supreme court reduced the compensatory damages from $15 million to $5 million. *Id.* at 49, 111 S.W.3d at 357. This was despite the fact that the plaintiff "suffered considerably and was not properly cared for." *Id.* at 44, 111 S.W.3d at 354. The evidence supported factual findings that

> Mrs. Sauer died in the care of Rich Mountain from severe malnutrition and dehydration. There was evidence presented that she was found at times with dried feces under her fingernails from scratching herself while lying in her own excrement. At other times, she was not "gotten up" out of her bed as she should have been. Often times, Mrs. Sauer's food tray was found in her room, untouched because there was no staff member at the nursing home available to feed her. She was not provided with "range of motion" assistance when the facility was short of staff. On one occasion, her son complained to staff that he had found his mother at 3:00 p.m., still in her gown, wet with urine, disturbed, and upset.
>
> Testimony further revealed that at times, there was not enough hot water with which patients could shower. Mrs. Sauer was often times found wet without being changed in four hours. She had pressure sores on her back, lower buttock, and arms on days she was found sitting in urine and excrement. A former staff member remembered seeing Mrs. Sauer at one time with a pressure sore the size of a softball, which was open. Her sores and blisters became infected. She was frequently double-padded, and even triple-padded, rather than single-padded for her incontinence problems. At times, she had no water pitcher in her room; nor did she receive a bath for a week or longer, due to there not being enough staff at the facility. She was described as "always thirsty" and her nursing notes indicated that she was heard moaning and crying. At the time she was hospitalized prior to her death, she had a severe vaginal infection. When she was in the geriatric chair, she was not "let loose" every two hours, as required by law. Finally, Mrs. Sauer was found to suffer from poor oral hygiene with caked food and debris in her mouth.

*Id.* at 43–44, 111 S.W.3d at 353–54.

The appellees in this case have presented evidence that is far, far less severe. They do note that their injuries are permanent, and they all have decades of life ahead. On the

contrary, Mrs. Sauer was ninety-three when she died and had a life expectancy of only two additional years, even absent her treatment at the nursing home. While that is true, as shown above, the appellees have not presented evidence of severe pain and suffering that will last their entire lives. The only evidence they have presented is that they suffered more at the time of exposure and that now, a few activities are affected, though not enough to change their life expectancies or earning capacities. The appellees argued in their briefing and in oral argument that they will experience a lifetime of feeling as if they are breathing through a straw. However, none of the appellees testified to that. The phrase was taken from Dr. Manaker's testimony in which he stated that it was an analogy he came up with to describe what some individuals experience.

The courts have reduced awards or ordered new trials for excessive pain-and-suffering verdicts in considerably less dramatic cases, as well. *Vaccaro* is but one example. Another is *Mattingly v. Griffin*, 235 Ark. 1028, 363 S.W.2d 919 (1963). In *Mattingly*, the jury returned a verdict of $8,000 after a car accident, and all but $105 was for pain and suffering. The plaintiff in that case had strained back and neck muscles. The supreme court affirmed on the condition of remittitur, holding that "any amount above $5,000.00 for pain and suffering is excessive." *Id.* at 1032, 363 S.W.2d at 922.

In the present case, the appellees only requested damages for (1) "the nature, extent, duration, and permanency of any injury and whether it is temporary or permanent"; and (2) "[a]ny pain and suffering and mental anguish experienced in the past and reasonably certain to be experienced in the future." They received a total of $75 million, but we now consider

54

the verdict awarded to the appellees individually, in the light most positive to each, as the nonmoving parties.

## 2. *Frank McMillion*

The jury awarded McMillion $25 million, and the circuit court entered judgment for that amount. At the time of exposure, McMillion felt dizzy, lightheaded, and nauseated. Later at the scene, he had trouble breathing and felt his nose and throat burning. He went to the emergency room the day of the exposure and went to another doctor for shortness of breath one time a few months later. He said that he still experiences shortness of breath and sometimes feels like a fish out of water when he is trying to exert himself. Although he has not had to stop his activities, his shortness of breath has caused him to preach shorter sermons, hunt and fish less, and play with his grandchildren less. When he hunts and fishes, he gets tired more easily and he cannot walk as far to his deer stand. He also has more trouble doing physical activities, like moving furniture and yard work. He coughs a lot after eating and snores more. Dr. Manaker diagnosed him with RADS, which can cause coughing, shortness of breath, and reduced exercise tolerance. Dr. Manaker also diagnosed him with worsening rhinosinusitis, which is inflammation in the sinus cavity, worsening GERD, and worsening coronary artery disease.

While there is more proof of injury than was present in *Vaccaro*, $25 million for the worsening of some preexisting conditions and shortness of breath shocks the conscience. There was no evidence presented of past and future medical expenses. Although Dr. Manaker testified that the injuries are permanent, and they do affect his life somewhat, it

does not rise to the level of a $25 million award. He does not have any loss of earning capacity (in fact, he has been promoted) or scars. He did testify to some pain and suffering, especially at the time of the exposure, but the award of $25 million for the pain he described shocks the conscience and demonstrates prejudice and passion on the part of the jury.

3. *Bengi Bokker*

The jury awarded $20 million to Bengi Bokker, and the circuit court entered judgment for that amount. According to his testimony, his injuries and pain and suffering are less than McMillion's. At the time of the exposure, Bengi felt like someone put a pillow over his face, and he could not breathe. This was at the time of exposure only. He also felt a burning sensation in his nose and throat. He went to the emergency room on the date of the accident. He still has shortness of breath and tires easily, especially on exertion. He coughs every day and often feels like he has an obstruction in his throat. His endurance has changed, and he has to get help at work to complete physical tasks, where he did not have to get such help before the exposure. When he overexerts himself, he feels like he is running thin of oxygen and has chest pains. He testified this might happen once a week. He still hunts thirty to thirty-five days a year. Dr. Manaker diagnosed Bengi with RADS and a worsening of GERD.

Again, this verdict shocks the conscience. There was no evidence presented of past and future medical expenses. Although Dr. Manaker testified that the injuries are permanent and that they do affect his life somewhat, it does not rise to the level of a $20 million award. He does not have any loss of earning capacity or scars. He did testify to some pain and

suffering, especially at the time of the exposure, but awarding $20 million for the pain he described shocks the conscience and demonstrates prejudice and passion on the part of the jury.

### 4. *Allen Jones*

The jury awarded Allen Jones $15 million, and the circuit court entered judgment for that amount. At the time of the exposure, Jones told his wife that it felt like a blowtorch was blowing up his nose, and he became flushed. This was only at the time of the accident. He was treated at the emergency room the day of the accident, and he has been to a pulmonologist a few times after. In the days after the accident, skin sloughed off the inside of Jones's nasal passages, and he experienced a tingling in the back of his throat. He continues to experience shortness of breath when doing activities like getting dressed and walking short distances. He still has dry mouth and pain in his sinuses to the point they feel like they are on fire sometimes, though he did not testify how often that happens. He has trouble sleeping, and at night, there is a mucas-type drainage from his nose that stains his pillows. The shortness of breath has negatively affected intimacy with his wife. He was more active before the accident and invited friends over more often. Jones testified that the shortness of breath hinders his reaction time as a law enforcement officer and slows his actions. Jones missed one day of work after the accident, but he did not seek lost wages. He also had respiratory problems the month before the accident and smoked until 2020 (approximately two years after the exposure). He testified that his shortness of breath has gotten better since he quit smoking. Dr. Manaker diagnosed Jones with no new conditions

but with worsening of GERD and rhinosinusitis. He also testified that Jones had mild COPD before the exposure and that it is now moderate.

Jones testified to more severe pain, at least sometimes, than the other appellees. However, we still believe the $15 million verdict shocks the conscience, given the evidence. There was no evidence presented of past and future medical expenses. Although Dr. Manaker testified that the injuries are permanent and that they do affect Jones's life, they do not justify a $15 million award, especially considering his injuries were exacerbations of preexisting conditions, some of which have improved since he stopped smoking. He does not have any loss of earning capacity (in fact, he has been promoted) or scars. He did testify to some pain and suffering, especially at the time of the exposure, but awarding $15 million for the pain he described shocks the conscience and demonstrates prejudice and passion on the part of the jury.

5. *Hunter Bokker*

The jury awarded Hunter Bokker $5 million, and the circuit court entered judgment for that amount. Hunter went to the emergency room the night of the exposure, complaining of a slight headache and burning throat. His primary symptom is shortness of breath, and he says it is harder to do his job than it was before the accident. He also has shortness of breath when using excessive physical force. He testified that it can be painful to rub his nose at times because skin sloughs off his nasal passages. He went to see a pulmonologist once after the accident. Hunter did not lose any income, and he still duck hunts around thirty

days a year. Dr. Manaker diagnosed Hunter with rhinosinusitis, GERD, and tonsil stones due to the exposure.

Even though Hunter's verdict is smaller than the verdicts of the three above, we still believe $5 million shocks the conscience. There was no evidence presented of future medical expenses, and the medical bills for his treatment related to the exposure added up to only $4,254. Although Dr. Manaker testified the injuries are permanent, there was insufficient evidence that they greatly affect Hunter's life, considering he is still able to do the things he could do before the accident but simply feels short of breath on excessive exertion. He does not have any loss of earning capacity or scars. Further, he testified to only mild pain at the time of the exposure. An award of $5 million for the pain he described shocks the conscience and demonstrates prejudice and passion on the part of the jury.

6. *Zack Billingsley*

The jury awarded Zack Billingsley $5 million, and the circuit court entered judgment for that amount. Zack testified that at the time of the exposure it felt like someone was holding a washcloth over his nose, and it took his breath away completely. His eyes and nose were also burning. Zack was taken by ambulance to the emergency room after the exposure. He testified that he went to a doctor in Forrest City for shortness of breath one time after the accident. Since the accident, he can no longer walk long distances while hunting and now has to park near his deer stand, though he goes deer hunting two or three times a week during the season. He does not claim any lost earnings and is able to deliver 120–140 packages a day as a UPS driver. While he did not testify to how often or under what

circumstances (other than hunting), he said that he has experienced burning air passages and shortness of breath since the accident. He currently uses an e-cigarette, and he dipped snuff through 2021. He testified that the injuries have not affected him continuously. Dr. Manaker diagnosed Billingsley with RADS.

Here, the award of $5 million shocks the conscience. There was no evidence presented of future medical expenses, and the medical bills related to this exposure totaled $5,497. Although Dr. Manaker testified that the injuries are permanent, the only seeming effect is that Billingsley gets winded while hunting. He is still able to deliver 120–140 packages a day as a UPS driver. He does not have any loss of earning capacity or scars. Further, his only real testimony about pain was that he had pain at the time of the exposure. Given these factors, Billingsley's verdict shocks the conscience and demonstrates prejudice and passion on the part of the jury.

### 7. *Carlton Pettus*

The jury awarded Carlton Pettus $5 million, and the circuit court entered judgment for that amount. Pettus testified that during the exposure, his eyes and nose were burning and he could not breathe. He felt like someone put a sack over his face during the exposure. Pettus went to the emergency room the night of the accident and to a pulmonologist approximately one year after. He said he experienced shortness of breath and wheezing and had nasal problems for a few months after the exposure. He currently works as a firefighter. The only specific incident he testified about that showed a continued effect on his life was that he had to sit down and catch his breath after doing 20–30 minutes of chores while

carrying his one-year-old daughter. Dr. Manaker diagnosed him with worsening rhinosinusitis and worsening asthma.

Like those above, Pettus's award of $5 million shocks the conscience. There was no evidence presented of future medical expenses, and the medical bills related to this exposure totaled $5,405. Although Dr. Manaker testified that the injuries are permanent, the only seeming effect is that he had to catch his breath after exerting himself during chores. His permanent injuries are also linked to his preexisting conditions. Pettus is still able to work as a firefighter. He does not have any loss of earning capacity or scars. Further, his only real testimony about pain was that he had pain at the time of the exposure. Given these factors, Pettus's verdict shocks the conscience and demonstrates prejudice and passion on the part of the jury.

As discussed in the analysis above, the verdicts were excessive, and the damages were not supported by substantial evidence. They were so great as to shock the conscience and demonstrate passion or prejudice on the part of the jury. For these reasons, we conclude that the circuit court abused its discretion in denying the motion for new trial or remittitur.

Accordingly, we remand for a new trial on damages.

Affirmed in part; reversed and remanded in part.

THYER and WOOD, JJ., agree.

*Munson, Rowlett, Moore and Boone, P.A.*, by: *Zachary Hill*, for appellants.

*Bailey & Oliver Law Firm*, by: *Sach D. Oliver, Frank H. Bailey, T. Ryan Scott, Geoff Hamby,* and *Samuel W. Mason*; *Easley & Houseal, PLLC*, by: *John I. Houseal, B. Michael Easley*, and *Austin H. Easley*; and *Brian G. Brooks, Attorney at Law, PLLC*, by: *Brian G. Brooks*, for appellees.